UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MANUEL VASQUEZ,                         §
TDCJ No. 999336,                        §
                                        §
        Petitioner,                     §
                                        §
V.                                      §       CIVIL NO. SA-09-CA-930-XR
                                        §
RICK THALER, Director,                  §
Texas Department of Criminal            §
Justice, Correctional                   §
Institutions Division,                  §
                                        §
        Respondent.                     §

MEMORANDUM OPINION AND ORDER

Petitioner Manuel "Meme" Vasquez filed this federal habeas corpus action pursuant to Title

28 U.S.C. Section 2254 challenging his November, 1999 Bexar County capital murder conviction

and sentence of death.  For the reasons set forth hereinafter, petitioner is entitled to neither federal

habeas corpus relief nor a Certificate of Appealability from this Court.

I. Statement of the Case

A.      The Offense

Viewed in the light most favorable to the jury's verdict, the evidence at petitioner's capital

murder trial showed that, during the early morning hours of March 19, 1998, petitioner, a member

of the Mexican Mafia,[1] acting with the assistance of Johnny Joe Cruz and Oligario "Bebe" Lujan,

---

[1] Prosecution witness Johnny Joe Cruz testified at the guilt-innocence phase of petitioner's capital murder trial, in pertinent part, that (1) while he was a not a "member" of the Mexican Mafia, both petitioner and Oligario Lujan were members of the gang and (2) he began associating with members of the Mexican Mafia in early 1998. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 18, testimony of Johnny Joe Cruz, at pp. 25, 35.

The Fifth Circuit has chronicled the origins, organization, and operations of the Mexican Mafia in the first two decades after its founding. *United States v. Valles*, 484 F.3d 745, 747-50 (5th

(1) forced their way into a motel room occupied by Juanita Ybarra and Moses Bazan,[2] (2) assaulted Bazan until Bazan was rendered unconscious,[3] (3)

---

Cir.), *cert. denied sub nom. Garcia-Esparza v. U.S.*, 551 U.S. 1155 (2007).  The Fifth Circuit's opinion in *Valles* furnishes a comprehensive context for this Court's discussion of petitioner's involvement in enforcing "the dime" for the Mexican Mafia.

[2] Moses Bazan testified during the guilt-innocense phase of petitioner's capital murder trial, in pertinent part, that (1) he knew Cruz from high school, (2) he knew Lujan, who had done yard work for Ybarra in the past, (3) he saw petitioner, whom he met through Lujan, (4) he went to bed around midnight, (5) around three a.m., Lujan knocked on the door to the motel room Bazan and Ybarra were sharing, (6) when he looked out a window, Bazan saw Lujan and several guys outside, and (7) when Bazan opened the door a little, three or four people wearing masks or some kind of cloth over their faces pushed the door open and rushed into the room. S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 104, 109-14, 118-19, 121-24, 148-50.

[3] Bazan testified further that (1) he told the men who rushed into the motel room to take his wallet, (2) petitioner moved toward Ybarra and attempted to choke her, (3) petitioner called out at one point "she bit me," (4) Bazan fought with Cruz, Lujan, and petitioner, primarily with Lujan and Cruz, (5) he saw petitioner strike Ybarra many times as Ybarra yelled for help, (6) Bazan unsuccessfully attempted to get out the door, (7) Cruz and Lujan struck Bazan many times, tackled Bazan, and kicked Bazan in the ribs, fracturing Bazan's ribs in the process, (8) Bazan continued resisting as Cruz and Lujan tied Bazan's legs, (9) Bazan struck and broke a window and kicked the wall, breaking the sheet rock, (10) Cruz stabbed Bazan in the hand with a knife, (11) Cruz put an extension cord around Bazan's neck and choked Bazan while Lujan choked Bazan with his hands, (12) Cruz and Lujan choked Bazan until Bazan pretended to lose consciousness, (13) Bazan heard Ybarra yell what sounded to him like her last breath, (14) Bazan could not tell who was on top of Ybarra at that instant, (15) Bazan heard petitioner punch Ybarra one last time, (16) Bazan did not see anyone strangle Ybarra, (17) throughout the melee, Cruz was going back and forth between Bazan and Ybarra, (18) Bazan saw Cruz punch Ybarra, (19) Cruz took off his mask and Lujan berated Cruz for doing so but Cruz remarked that Bazan was not going to live, (20) Cruz grabbed Bazan's head and stabbed Bazan in the head, (21) Bazan rolled his eyes back into his head and pretended to be dead, (22) Lujan asked for the knife, said he wanted to finish off Bazan, and then stabbed Bazan in the head with the knife or some kind of weapon, (23) Cruz and Lujan stopped hitting and stabbing Bazan and closed his eyes, (24) one of the assailants suggested taking Bazan's body out, cutting him up, and throwing the pieces in the lake, but they were unable to lift Bazan, (25) Bazan heard one of his assailants say "we've been here too long," and (26) Bazan lost consciousness, possibly due to blood loss. S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 121-33, 150-51, 154-58, 159-63, 165.  Bazan candidly admitted he had previously given police a statement indicating there had been a fourth assailant but testified at trial that he was no longer certain there had been a fourth assailant. *Id.*, at pp. 123, 154, 156, 162-63, 165.

Cruz testified (1) some time between 5:30 and 6:30 a.m., he, Lujan, and petitioner prepared

fatally strangled Ybarra,[4] and (4) ransacked the room in an effort to collect items of value to pay "the dime," (i.e., the ten percent tax the Mexican Mafia imposes and forcibly collects on sales of illegal drugs in Bexar County) which Ybarra had refused to pay.[5]   Bazan recovered from his injuries and

---

to go to Ybarra's room and "do what we were told to do," (2) Cruz and petitioner wore bandanas over their faces and socks over their hands to avoid leaving fingerprints, (3) Cruz and petitioner waited while Lujan knocked on Ybarra's motel room door, (4) Cruz pushed Lujan through the door and the chain on the door broke as the three men rushed into the room, (5) Cruz and Lujan wrestled with Bazan, who threw a punch and broke a window, (6) Ybarra was laying on the bed, possibly asleep, when they entered her room, (7) immediately, Bazan and Ybarra both began yelling, (8) Ybarra yelled at them to take the money and drugs and whatever they wanted and leave them alone, (9) petitioner went over to Ybarra and got on top of her, (10) by the time Cruz and Lujan subdued Bazan, Ybarra appeared to be unconscious, (11) Cruz saw petitioner choking Ybarra, (12) petitioner asked Lujan for the telephone cord and Lujan handed it to petitioner, (13) Bazan regained consciousness and began fighting again, (14) petitioner threw a kitchen knife to Lujan and directed Lujan to "take care of your business," (15) Lujan acted like he was going to stab Bazan but did not do so, instead Lujan stabbed the floor near Bazan, (16)  Bazan began kicking and knocked a hole in the wall, (17) Lujan fought with Bazan while Cruz searched the motel room for valuables, (18) petitioner pulled out a gun and appeared ready to shoot Bazan but Lujan asked why petitioner was going to shoot Bazan, (19) instead of shooting Bazan, petitioner struck Bazan with the gun on the head, (20) the trigger guard on petitioner's gun broke and cut Bazan, and (21) Bazan was knocked unconscious again. S.F. trial, Volume 18, testimony of Johnny Joe Cruz, at pp. 40-51.

[4] Bazan testified at trial that he saw both petitioner and Cruz strike Ybarra repeatedly, heard what sounded like Ybarra being choked or strangled, but did not actually see anyone strangle Ybarra. S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 125-26, 129-30, 145-46.  Bazan was clear, however, that petitioner assaulted Ybarra the whole time Bazan was conscious. *Id.*, at pp. 159-60.
      Cruz testified (1) petitioner went to Ybarra when they entered the motel room, (2) after Cruz and Lujan subdued Bazan the first time, he saw petitioner on top of Ybarra on the bed with Ybarra on her stomach, (3) petitioner asked Lujan for the telephone cord and Lujan handed it to petitioner, and (4) Cruz saw petitioner choking Ybarra. S.F. Trial, Volume 18, testimony of Johnny Joe Cruz, at pp. 45-47.

[5] Cruz testified, without contradiction, at the guilt-innocence phase of petitioner's capital murder trial that (1) about two days before the murder, petitioner and Lujan told Cruz that Ybarra had to go down "because she wasn't paying her ten percent," (2) Lujan told Cruz that Ybarra "had to go down," which Cruz understood meant she had to be killed, (3) Ybarra was killed because she was not paying the ten percent sales tax on street drugs levied by the Mexican Mafia, (4) Lujan and petitioner are members of the Mexican Mafia, (5) in addition to killing Ybarra, they were supposed to rob her to collect the ten percent tax, (6) the order to kill Ybarra came from Rene "Flaco" Munoz, a ranking member of the Mexican Mafia, (7) once Bazan was subdued, Cruz began ransacking the

identified (1) petitioner, Cruz, and Lujan as the assailants who broke into the motel room and (2)

petitioner as the primary assailant who fatally attacked Ybarra.[6]

B.      Indictment

On June 10, 1998, a Bexar County grand jury indicted petitioner on a single count of capital

murder, charging petitioner with having intentionally caused Ybarra's death by strangling Ybarra

with a ligature while in the course of committing and attempting to commit the offense of robbing

Ybarra.[7]

C.      Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial commenced on November 2,

1999.

1.      The Prosecution's Case

In addition to the testimony of petitioner's accomplice Cruz and Bazan's account of the

assaults upon himself and Ybarra summarized above, the jury heard testimony from (1) a veteran San

Antonio police detective concerning the history, organization, and methods of operation employed

---

motel room looking for valuables and placed items in a pillow case, (8) petitioner took rings and
necklaces off Ybarra's body, (9) Cruz took a camera and jewelry he found, (10) Lujan took a
necklace and some rings off Bazan, (11) petitioner found some cocaine inside Ybarra's bra and took
the cocaine, (12) they fled the scene when Cruz heard sirens in the distance, (13) petitioner drove
them away from the crime scene in Michelle Rodriguez's automobile, and (14) they went to George
Martinez's residence, where they unloaded the property that they had taken from the motel room and
changed out of their bloody clothing. S.F. Trial, Volume 18, testimony of Johnny Joe Cruz, at pp.
32, 34-41, 47-53, 55-56, 92-95. Cruz also testified the three assailants were not inside Ybarra's
motel room any longer than ten minutes. *Id.*, at p. 65.

[6] *See notes 3-4, supra.*

[7] Transcript of pleadings, motions, and other documents filed in petitioner's state trial court
proceedings (henceforth "Trial Transcript"), Volume 1, at p. 16. Petitioner was indicted in cause no.
98-CR-3116C.

4

by the Mexican Mafia, including the gang's collection of "el dime" or "the dime,"[8] (2) San Antonio

police officers who were dispatched to the crime scene and processed same,[9] (3) a forensic serologist

_____

[8] More specifically, a San Antonio Police detective investigator who had worked closely with federal law enforcement authorities in connection with the 1990, 1994, and 1998 federal prosecutions of Mexican Mafia leaders testified, in pertinent part, that (1) he had reviewed over 500 letters between incarcerated Mexican Mafia members intercepted by prison officials,  (2) he had monitored wiretaps of telephone conversations between high-ranking Mexican Mafia officials, (3) he had spoken with confidential informants about the gang, (4) the Mexican Mafia began within the Texas state prison system around 1984, (5) the gang was founded with a cultural heritage related to Azteca and formally organized as a criminal organization, (6) the gang is involved in extortion, narcotics trafficking, and murder, both inside and outside of prison, (7) the gang is organized in a hierarchy with a president, vice-president, several generals, captains, and lieutenants, sergeants, and soldiers, (8) "the dime" or "el dime" is a street tax assessed on narcotics dealers by the gang, (9) drug dealers are contacted and informed they must pay the tax in order to remain in business, (10) non-payment of "the dime" results in Mexican Mafia members taking dealers' belongings. vehicles, etc, (11) continued refusal to pay the dime "you probably get killed," (12) Mexican Mafia members have distinctive tattoos, which include serpents, eagles, sunbursts with the word "Mexikanemi", (13) between late 1997 to early 1998, Rene "Flaco" Munoz was a Mexican Mafia lieutenant but is now a protected federal witness, and (14)  Mexican Mafia soldiers do the dirty work. S.F. Trial, Volume 18, testimony of Arnulfo Chavarria, at pp. 166-87.

[9] A San Antonio Police officer who arrived at the crime scene around 8:30 a.m. the date of the murder testified, in pertinent part, that (1) Moses Bazan, the surviving victim, had suffered serious, life-threatening, injuries, (2) Bazan refused to identify his attackers at the scene, and (3) Bazan had suffered gashes to his head and was very bloody. S.F. Trial, Volume 19, testimony of Jose Bara, Jr., at pp. 9-19.
    Another police officer who arrived at the scene about the same time, testified (1) Bazan was bloody and appeared disoriented, (2) Bazan appeared to be going in and out consciousness, (3) Bazan appeared to have been beaten severely about the face and head, (4) a restraint consisting of a wire and cloth shirt were wound around Bazan's neck, (5) a wire and cloth were also wound around Bazan's ankles, (6) room 15 of the motel had been ransacked, (7) a dead female was laying face down on the bed inside room 15, and (8) the female victim was bound. S.F. Trial, Volume 19, testimony of Robert Rosales, at pp. 20-25.
    Another police officer, who videotaped the crime scene, testified (1) there was a broken window and a hole in the wall of room 15, (2) a knife was found in room 15, (3) room 15 appeared to be in disarray, (4) Ybarra's hands were tied behind her back with a phone cord and a cord and towel were wrapped around her neck, (5) Ybarra's face had been badly beaten, and (6) police found two syringes, many beer bottles, several baggies, and a spoon in room 15. S.F. trial, Volume 19, testimony of Ted Prosser, at pp. 25-47.  The videotape recording of the crime scene was admitted into evidence as State Exhibit no. 32 and played in open court for the jury. *Id.*, at p. 36.
    An evidence technician testified regarding the numerous items of physical evidence

concerning the results of DNA testing on items found at the crime scene,[10] (4) the forensic

pathologist who performed Ybarra's autopsy,[11] (5) a person who spent the evening before the murder

with petitioner, Cruz, and Lujan and witnessed some of their preparations for the robbery,[12] (6) a

---

recovered by police at the crime scene, including a knife, a spoon with white residue, a piece of electrical cord, a piece of electrical wire, bloody bed linen, bloody clothing, and various others items believed to contain blood. S.F. Trial, Volume 19, testimony of Joe De La Luz, at pp. 48-62.

A San Antonio Police detective testified about blood-stained clothing recovered from the trunk of Michelle Rodriguez's vehicle. S.F. Trial, Volume 19, testimony of John Bocke, at pp. 63-78.

In addition, the manager of the New Laredo Motel testified Moses Bazan, Johnny Joe Cruz, and petitioner all rented rooms at his establishment in the days prior to the murder. S.F. trial, Volume 19, testimony of Hitendra Bhakta, at pp. 83-85. Mr. Bhakta also testified his wife informed him that the occupants of room 16 had checked out of their room at approximately 7:45 a.m. the morning of the murder. *Id.*, at p. 86.

[10] A forensic serologist with the Bexar County Forensic Science Center testified (1) Ybarra's fingernail clippings, a knife, and numerous items of clothing recovered from the crime scene and the trunk of Michelle Rodriguez's vehicle were tested for the presence of DNA and (2) petitioner could not be excluded as a possible source of the DNA found on a pair of bloody shorts found in the trunk of Michelle Rodriguez's car. S.F. Trial, Volume 19, testimony of Gustavo De Leon, at pp. 99-112. While it is far from clear from the record, it appears the shorts to which Mr. De Leon referred were those photographed in State Exhibit no. 68, which had been found in Ms. Rodriguez's vehicle during a consent search.

[11] The forensic pathologist who performed Ybarra's autopsy testified (1) Ybarra's hands had been bound behind her back and a ligature was wrapped around Ybarra's neck, (2) Ybarra suffered blunt force trauma to her face, evidenced by bruises to her face and head and lacerations on her lips, (3) Ybarra's face and the whites or her eyes displayed Petechiae - signs of broken blood vessels resulting from compression of Ybarra's neck, (4) internal examination showed bruises and hemorrhages to the back and left side of Ybarra's head, (5) Ybarra's neck displayed a "ligature furrow" indicative of a cord having been tied around Ybarra's neck  and pressure having been applied to strangle Ybarra, (6) a bruise to the left side of Ybarra's neck was consistent with a knot in the ligature towel having been present at that location, (7) Ybarra suffered abrasions to the lower front of her neck and bruising to her upper chest and upper and lower left back, (8) Ybarra's back bore scratches, (9) the cause of Ybarra's death was ligature strangulation which occurred over several minutes, (10) she would have expected Ybarra to struggle against her attacker if Ybarra had been conscious when the ligature was applied, and (11) a cocaine metabolite was found in Ybarra's vitreous humor. S.F. Trial, Volume 20, testimony of Jennifer Rulon, at pp. 22-42.

[12] A teenager testified (1) she spent the evening before Ybarra's murder with petitioner, Cruz, Lujan, Michelle Rodriguez, and several others in room 20 of the New Laredo Motel, (2) throughout

police detective regarding photographs taken of petitioner at the time of petitioner's arrest showing injuries to petitioner's neck, hands, and forearms,[13] and (7) the person who loaned petitioner her vehicle around the time of the murder.[14]

 2.  The Defense's Evidence

_____

the night, she saw Cruz, Lujan, petitioner, and others going into and coming out of the bathroom, where she believed they were doing heroin, (3) her belief was based in part on the fact her friend Melissa's arm was swollen when Melissa exited the bathroom at one point, (4) later, she saw petitioner, Lujan, and Cruz getting out towels and bandanas, (5) she heard one of those three say "Let's go get someone," (6) petitioner woke up Michelle Rodriguez at one point to ask Michelle for her car keys, which Michelle gave to petitioner, (7) she saw petitioner putting a towel to his face and then the three men left, (8) she gave police a false statement when they questioned her the morning of the murder, (9) when she and Michelle later returned to the motel, Michelle's car was not there, (10) she and Michelle walked to George Martinez's house a few blocks away, (11) at George Martinez's house, she observed towels full of blood near the kitchen doorway, (12) she later saw several people drive off in Michelle's car, and (13) following his arrest, petitioner told her not to talk to the prosecutor. S.F. Trial, Volume 18, testimony of Amelia Garcia, at pp. 187-98, 203-20.

 [13] S.F. Trial, Volume 19, testimony of Andrew Carian, at pp. 140-44.  The photographs in question were admitted into evidence as State Exhibit nos. 85-88. *Id.*, at pp. 141-42.  Detective Carian also testified that, contrary to Cruz's trial testimony, police arrested Cruz on March 20, 1998, not the day of the murder as Cruz had insisted. *Id.*, at p. 144.

 [14] A former paramour of petitioner testified (1) she met petitioner through George Martinez and Angie Chavarria, (2) she and her one-year-old went to the New Laredo Motel in her car on March 18, 1998, (3) they stayed with petitioner and several others in room 20, (4) she went to the store for snacks twice that night, (5) she was unaware of anything going on in the bathroom and did not see any narcotics before she went to sleep between 11:30 and 11:45 p.m., (6) petitioner awakened her to ask for her car keys, (7) she then went back to sleep, (8) when she awoke, her car was not there, (9) she did not tell police the truth when they questioned her the morning of the murder, (10) later, she saw her car at George and Angie's house but did not see petitioner, (11) she did not see her car again for about a week, when she saw same at the police impound lot, (12) she gave police permission to search her vehicle, (13) most of the contents of her car's truck were items that did not belong to her, including the bloody clothing found therein, (14) she did not see any bloody clothing inside George and Angie's house, and (15) she did not recall going to the hospital with petitioner the night after the murder. S.F. Trial, Volume 18, testimony of Michelle Rodriguez, at pp. 223-42.

Petitioner's trial counsel presented (1) a prosecution witness who testified regarding petitioner's activities the evening after Ybarra's murder,[15] (2) an alibi witness who testified she picked petitioner up between 6:30 and 6:45 a.m. the morning of the murder and took petitioner to her home, where she found him sleeping when she returned around noon,[16] (3) a Bexar County Adult Detention Center inmate who testified Cruz told him that petitioner was not involved in Ybarra's murder,[17] and (4) a forensic toxicologist who testified concerning the effects of cocaine abuse on the brain and the propensity for violence observed in those persons under the influence of cocaine.[18]

---

[15] When recalled by petitioner's trial counsel and confronted with medical records showing her daughter was treated at the hospital on the evening of March 19, 1998, i.e., the evening *after* the murder, Ms. Rodriguez acknowledged that petitioner had driven her and her daughter to the hospital that evening to seek treatment for her daughter's symptoms. S.F. Trial, Volume 20, testimony of Michelle Rodriguez, at pp. 61-65.

[16] Another of petitioner's paramours testified (1) she dated petitioner in March, 1998 during a time when she and her husband had separated, (2) petitioner telephoned her between 5:50 and 6:00 a.m. on the morning of March 19, 1998, (2) petitioner asked her to pick him up at a location near the New Laredo Motel, (3) she took her children with her to pick up petitioner, (4) she picked up petitioner between 6:30 and 6:45 a.m. that same morning, (5) petitioner was wearing jeans, tennis shoes, a tee shirt, and a cap, (6) petitioner's demeanor was unremarkable, (7) she saw no injuries on petitioner and no blood on him, (8) she dropped off her children at school, dropped off petitioner at her house, and went to work, (9) around noon, she saw television reports about Ybarra's murder and tried unsuccessfully to page petitioner, (10) she drove back to her home, where she found petitioner sleeping soundly, (11) after returning home from work at the end of the day, she dropped petitioner off at George and Angie's house, and (12) she denied ever seeing needle tracks on petitioner's arms. S.F. Trial, Volume 20, testimony of Mercedes Villarreal, at pp. 74-95.

[17] Hector Galvan testified (1) Cruz told Galvan that he (Cruz) was Mexican Mafia, (2) Cruz told Galvan that petitioner was not involved in Ybarra's murder, and (3) he (Galvan) was not a Mexican Mafia member. S.F. Trial, Volume 20, testimony of Hector Galvan, at pp. 99-100, 109-14, 117.

[18] A forensic toxicologist testified (1) cocaine is a stimulant which causes an immediate and profound effect on the brain, (2) the effect of cocaine is to induce stimulation, similar to amphetamine, combined with euphoria, orgasmic excitement, trembling and tremors, paranoid psychosis, and violent behavior, (3) hallucinations and altered perception of reality are also side effects of cocaine use, along with memory loss, temporal disassociation (i.e., loss of time), impaired

3.      Prosecution's Rebuttal

The prosecution called a San Antonio Police detective who testified one of petitioner's witnesses, Hector Galvan, was a documented member of the Mexican Mafia, contrary to Galvan's testimony at petitioner's trial.[19]

4.      Verdict

On November 5, 199, after deliberating approximately two and a half hours, petitioner's jury returned its verdict, finding petitioner guilty beyond a reasonable doubt of capital murder.[20]

D.      Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on November 8, 1999.

1.      The Prosecution's Evidence

The prosecution presented witnesses and documentary evidence showing (1) petitioner's involvement (along with petitioner's younger brother George and others) in the 1986 murder of Robert Alva and petitioner's receipt of a ten-to-twelve year sentence for his role in that offense,[21] (2)

---

distance perception, (4) a small quantity of cocaine ingested at 9 p.m. would be unlikely to have any remaining effect by 6:00 a.m. the following morning, and (5) signs of intravenous drug use were apparent on petitioner's arm. S.F. Trial, Volume 20, testimony of James C. Garriott, at pp. 118-33.

[19] S.F. Trial, Volume 20, testimony of Arnulfo Chavarria, at p. 134.  Detective Chavarria testified Galvan had executed a formal statement to Texas state prison officials asserting Galvan's membership in the Mexican Mafia.

[20] S.F. Trial, Volume 21, at pp. 69-72; Trial Transcript, Volume 2, at pp. 319-34, 337-38. Petitioner's jury began its deliberations at approximately 11:04 a.m. and returned its verdict at approximately 2:35 p.m. on November 5, 1999. *Id.*

[21] A Bexar County Deputy Sheriff testified regarding (1) the discovery of Robert Alva's body in 1986, (2) bloodstains found inside Alva's vehicle, (3) the arrest of four persons, including petitioner and petitioner's brother George Vasquez, for Alva's murder, (4) petitioner's voluntary statement given April 2, 1987 in which petitioner admitted his participation in the fatal assault upon Alva, which petitioner claimed was initiated by petitioner's brother George, and (5) petitioner entry

petitioner's conviction for assault with bodily injury in connection with an August, 1986 robbery,[22]

---

of a guilty plea to a charge of aggravated assault and receipt of a ten-to-twelve year sentence while petitioner's brother George received a sentence of 45-50 years. S.F. Trial, Volume 22, testimony of Sal Marin, at pp. 12-28. Petitioner's three-page written statement confessing petitioner's participation in the assault upon Alva was admitted into evidence as State Exhibit no. 120, was read in open court at petitioner's trial, and is found in S.F. Trial, Volume 26. *Id.*, at pp. 21-27.

A San Antonio Police Department fingerprint examiner testified petitioner's fingerprints matched those of the pen packet admitted into evidence as State Exhibit no. 121 (also found in S.F. Trial, Volume 26) which memorializes petitioner's October, 1987 conviction for aggravated assault causing bodily injury. S.F. Trial, Volume 22, testimony of Vernon Ginn, at pp. 29-31.

The medical examiner who performed the autopsy on Alva's body testified (1) Alva suffered six lacerations to the head above the left ear temporal to the parietal scalp area, (2) all those lacerations were the products of blunt force trauma, (3) Alva suffered a large area of bruising around the nose, left orbital area, left forehead and temporal area, (4) Alva suffered lacerations to the left ear, top of the head on the left side, and the front of the left ear, as well as the back of the head and left side of the head, (5) Alva suffered an incised wound to the left ear, two abrasions to the neck - above the trachea on the right side of the neck and at the base of the neck on the left side - possibly consistent with attempted strangulation, (6) Alva suffered multiple skull fractures on the left temporal and parietal areas, (7) upon internal examination it became apparent an instrument had penetrated Alva's skull and caused multiple comminuted skull fractures and lacerations to the brain itself, (8) Alva's brain showed bleeding along the surface, (9) the cause of Alva's death was cranial cerebral injuries, multiple skull fractures, and penetrating injuries to the brain, (10) Alva also suffered bruises to both hands, (11) Alva's blood alcohol and vitreous alcohol levels were both above 0.25, and (12) this indicated Alva was acutely intoxicated at the time of his death, suffered from poor coordination, and it was unlikely Alva could have defended himself at the time he was attacked. S.F. Trial, Volume 22, testimony of Robert Charles Bux, at pp. 131-37.

A Texas Department of Criminal Justice sociologist testified, in pertinent part, that (1) she interviewed petitioner on November 13, 1987, (2) petitioner described for her his role in Alva's murder, (3) petitioner told her that he and his brother strangled Alva, drove Alva's car to an abandoned parking lot, and set Alva's body on fire, (4) petitioner related to her that his parents separated when petitioner was young, he engaged in marijuana and cocaine use as early as age sixteen, his father was incarcerated, he only completed the sixth grade, and there was a lack of male supervision in his household while he was growing up, (5) petitioner's IQ was measured in 1987 at 84, (6) petitioner was able to communicate feelings of being scared during Alva's murder. S.F. Trial, Volume 22, testimony of Joanne Matthews-Castillo, at pp. 74-77, 87-96, 99.

---

[22] An Assistant Bexar County District Attorney testified petitioner was indicted and convicted pursuant to a guilty plea in cause no. 86-CR-4117 on a charge of assault bodily injury (which was reduced from the original charge of robbery). S.F. Trial, Volume 22, testimony of Bill Pennington, at pp. 32-36. Petitioner's pen packet relating to that criminal proceeding was admitted into evidence at trial as State Exhibit no. 122 and appears in S.F. Trial, Volume 26.

(3) petitioner's execution of drug dealer Richard Pacheco in March, 1992 in retaliation for

Pacheco's failure to pay "the dime,"[23] (4) petitioner's violent conduct while incarcerated,[24] (5)

_____

[23] Self-described former Mexican Mafia member Martin Ramos testified (1) petitioner's nickname is "Meme," (2) he (Ramos) is a former member of the Mexican Mafia, having withdrawn from membership after he was "green-lighted, i.e., targeted for death by the Mexican Mafia following Ramos' cooperation with federal prosecutors investigating the gang, (3) "the dime" is the Mexican Mafia's street ten percent tax on illegal drug sales, (4) Ramos helped collect "the dime" while he was active in the Mexican Mafia, (5) the first time the Mexican Mafia found a drug seller had not paid "the dime," the drug seller was robbed, (6) the second time the Mexican Mafia found a drug seller had not paid "the dime," the drug seller was killed, (7) on March 5, 1992 Ramos and petitioner (both soldiers in the Mexican Mafia) went to the residence of Richard Pacheco and purchased LSD, (8) Pacheco had denied to the Mexican Mafia that he was selling drugs, (9) Ramos and petitioner were instructed to kill Pacheco, (10) Ramos and petitioner obtained guns from George Martinez and returned to Pacheco's residence with Chris Morales and Cynthia Diaz, (11) when they arrived at Pacheco's residence, petitioner, Morales, and Ramos entered Pacheco's residence, (12) Morales pointed out Pacheco lying, apparently asleep, on a sofa, (13) petitioner walked over to Pacheco in the darkened room, pointed his gun at Pacheco's forehead and fired two shots in rapid succession, (14) petitioner then called out Ramos' nickname "Beaker" in a loud voice and the assailants fled the scene, (15) Ramos heard a female crying as they departed the location, and (16) neither Ramos nor petitioner were ever prosecuted for Pacheco's murder. S.F. Trial, Volume 22, testimony of Martin Ramos, at pp. 39-53, 64.
    A medical examiner who reviewed the record from Pacheco's autopsy testified (1) Pacheco suffered two gunshot wounds - one to the forehead and the other to the right medical margin of the right eyebrow, (2) both gunshots entered the brain and caused brain injuries, (3) both wounds would have proven fatal individually, (4) one bullet went through the cerebellum and other passed through the basal ganglia, (5) one gunshot wound was a near contact wound fired within about one-half inch of the skin, (6) the other gunshot wound was intermediate range, i.e., it was fired within a few inches of the skin, possibly about six inches, (7) Pacheco's injuries would have caused instant unconsciousness and Pacheco would have stopped breathing shortly thereafter, (8) absent immediate medical attention, Pacheco would have died rapidly, (9) even with immediate medical attention, inevitably, Pacheco would have died due to brain death, and (10) Pacheco was under the influence of marijuana at the time of his death with a THC level of 11.16 nanograms per milliliter and also metabolite present in the blood. S.F. Trial, Volume 22, testimony of Robert Charles Bux, at pp. 138-43.

[24] A TDCJ sociologist testified, in pertinent part, that petitioner's TDCJ disciplinary records showed (1) petitioner was cited in March, 1990 for possession of a weapon, i.e., a homemade knife made from a flat piece of metal which petitioner admitted belonged to him, (2) petitioner was cited in October, 1989 for inciting (and later "signed off" on) a racially motivated riot between Mexican and black inmates which resulted in more than 170 inmates participating in the riot and two inmates going to the hospital with multiple stab wounds, and (3) petitioner was cited in July, 1989 for

petitioner's nearly fatal stabbing of Hector Zacharias in May, 1992 and petitioner's conviction for attempted murder arising from that incident,[25] and (6) petitioner's participation with several others in a series of burglaries committed in September-October, 1996 and a pair of unsolved armed robberies.[26]

_____

participating in a major altercation involving ten Hispanic and two white inmates after which petitioner was labeled a threat to other inmates and prison staff. S.F. Trial, Volume 22, testimony of Joanne Matthews-Castillo, at pp. 79-83.

A Bexar County Sheriff's department Sergeant testified petitioner's conduct while an inmate at the BCADC was "disruptive, violent, aggressive, and dangerous." S.F. Trial, Volume 23, testimony of Mark Gibson, at pp. 15-16.

[25] Hector Zacarias testified without contradiction at the punishment phase of petitioner's capital murder trial that (1) while attending a party in late-May, 1992, he observed petitioner talking with petitioner's girlfriend while holding a knife, (2) petitioner appeared to be threatening to stab his girlfriend, (3) he (Zacarias) turned around and stumbled, (4) he then felt a burning sensation on his back and a stab wound to his chest and fell to the floor, (5) Zacarias never attempted to intervene in petitioner's confrontation with petitioner's girlfriend, (6) Zacarias never said anything prior to being stabbed, (7) Zacarias never did anything to provoke petitioner, (8) Zacarias was stabbed in the back and the wound penetrated his lung, (9) EMS came and took Zacarias to the hospital where Zacarias' heart stopped and he had to be revived with electricity, and (10) Zacarias spent a month in the hospital recovering from his injury. S.F. Trial, Volume 22, testimony of Hector Zacarias, at pp. 116-22.

Two eyewitnesses to the events of May 31, 1992 testified (1) petitioner was arguing with his girlfriend Elizabeth Rodriguez, (2) Hector attempted to calm down petitioner and petitioner went after Hector, (3) a security guard was called after petitioner stabbed Hector, and (4) petitioner was dragged from the apartment as he yelled something about his gang "La Eme" getting back at others. S.F. Trial, Volume 22, testimony of Annabelle Rodriguez, at pp. 103-08; testimony of Veronica Lopez, at pp. 109-16.

A San Antonio Police officer testified he arrived at the scene on May 31, 1992 to find petitioner handcuffed by a security guard who was holding a knife. S.F. Trial, Volume 22, testimony of Juan Morales, at pp. 122-27.

A fingerprint examiner testified petitioner's prints matched those on a pen packet showing petitioner had been convicted of attempted murder in connection with the incident on May 31, 1992 and sentenced on February 1, 1993. S.F. Trial, Volume 22, testimony of Vernon Ginn, at pp. 128-29. The pen packet in question was admitted into evidence as State Exhibit no. 135 and is found in S.F. Trial, Volume 26.

[26] Petitioner's cousin testified (1) she assisted petitioner, Jeffrey Lang, and Christine Garcia in committing a series of burglaries of Pizza Hut restaurants in September and October of 1996, (2)

The prosecution also presented evidence showing (1) petitioner was found in possession of a letter from a general in the Mexican Mafia and a pair of treaties executed by the Mexican Mafia and other prison gangs[27] and (2) all members of the Mexican Mafia are required by that organization's written constitution to be familiar with the rules of the organization and to do the organization's business while incarcerated.[28]

### 2.    The Defense's Evidence

Petitioner's father testified (1) he left petitioner's mother and their family within six months after petitioner's birth, (2) he was frequently violent toward petitioner's mother, (3) after he left his

---

they committed the burglaries to get money to buy drugs, (3) she participated with petitioner and Jeffrey Lang in an armed robbery petitioner and Lang committed at a bar on SW Military Drive in which (a) Lang and petitioner obtained weapons from George Martinez and Lang's brother, (b) she went inside the bar to count the number of people inside, (c) after she returned, Lang and petitioner went inside the bar wearing bandanas over their faces and tee shirts over their hair, and (d) she remained in Lang's truck for about thirty minutes, at which time Lang and petitioner returned carrying their guns and money, and (4) she went with Lang and petitioner when they committed an armed robbery at the Laredo Motel during which (a) they parked at the Easy Shop near the motel, (b) petitioner (armed with an Uzi) and Lang walked to the motel, (c) ten to fifteen minutes later, they returned with petitioner carrying a pillowcase or bag containing a cell phone, pager, and other stolen property and (d) petitioner said he put his gun up the man's ass and took his jewelry, money, and cocaine which she saw, and (5) petitioner was never arrested for either of those two armed robberies. S.F. Trial, Volume 23, testimony of Jeanette Fernandez, at pp. 24-37.  Ms. Fernandez also testified (1) about an incident in 1985 when petitioner arrived uninvited at a family function and began beating his step-father Jesse Lasoya, (2) she has known petitioner all her life and petitioner was never beaten or abused as a child, (3) following petitioner's first incarceration, petitioner became mean and she is scared of him, (4) petitioner's former girlfriend Christine Garcia once took out a protective order against petitioner but petitioner violated that order, (5) on one occasion, she saw petitioner attempt to force Christine Garcia into Lang's vehicle, Garcia resisted until police arrived, and police handcuffed petitioner and Lang, and (6) petitioner made no effort to assist her on several occasions when Jeff Lang beat her up despite her pleas for his help. *Id.*, at pp. 36-46.

[27] S.F. Trial, Volume 23, testimony of Anita Price, at pp. 9-11.  Ms. Price also testified petitioner became upset and verbally abusive when his cell was searched September 22, 199 and the documents in question were discovered. *Id.*, at pp. 12-13.

[28] S.F. Trial, Volume 22, testimony of Arnulfo Chavarria, at pp. 147-51, 165-68.

family, he next saw them about nine months later, (4) he went to prison in 1976 and has been there ever since, serving a life sentence for murder (a charge reduced from capital murder), (5) the next time he saw petitioner was about seven years later when petitioner was about nine years old and visited him in prison, (6) he never saw petitioner as a teenager, (7) he wrote letters to his son while in prison, (8) he knows a person can change while in prison because he has done so, after having come to a personal relationship with Jesus Christ, and (9) in the past three or four months, the petitioner has also come to have a personal relationship with Jesus.[29]

Petitioner's uncle testified (1) petitioner's mother was physically abused by petitioner's father, (2) he saw bruises on petitioner's mother when she lived in the valley, (3) petitioner's mother was a "weak person," dependent upon her husbands and boyfriends, (4) petitioner was not a mean child but a good boy, (5) he did not believe petitioner was guilty of murder, (5) he was unaware of petitioner's Mexican Mafia tattoos or membership, and (6) he had no knowledge petitioner had ever beaten a woman.[30]

A female cousin of petitioner testified (1) she grew up just a couple houses down from petitioner's childhood home, (2) petitioner's step-father once threw petitioner against a wall, (3) she often saw bruises on petitioner, (4) petitioner was involved in an accident around age seven in which a vehicle rolled backward and petitioner's head was stuck between a tree and the car door, (5) petitioner's behavior changed after that accident in that he became hyperactive and unable to respond to questions promptly, (7) she had babysat petitioner prior to the accident and noticed the change in petitioner's behavior and demeanor afterward, (8) petitioner's step-father Jesse Lasoya was lazy,

---

[29] S.F. Trial, Volume 23, testimony of Manuel Rodas Vasquez, at pp. 56-64.

[30] S.F. Trial, Volume 23, testimony of Alfredo Fernandez, at pp. 65-72.

14

abusive toward petitioner's mother, and violent with petitioner and his siblings, (9) petitioner's family was on welfare the entire time petitioner was growing up, (10) she nonetheless trusted petitioner to babysit her own children when petitioner was a teenager, (11) the things she had heard petitioner had done were "not the Manuel that I've known," (12) petitioner was a good boy growing up, and (13) she is opposed to the death penalty in all cases.[31]

Petitioner's sister testified (1) she did not recall their biological father, (2) at one point their mother was married to a man named Patrick Hernandez with whose family they lived in either Michigan or Minnesota, (3) while they lived with the Hernandez family, Patrick's mother physically abused the Vasquez children by locking them in the basement and in closets, physically and verbally abused their mother, and treated the entire Vasquez family like slaves, (4) she and her brothers attempted to run away several times while their mother was at work but were always caught and punished, (5) their family moved to San Antonio when she started kindergarten, (6) in San Antonio, their mother met Jesse Lasoya, who was a lazy bum who refused to work regularly and was abusive toward their mother and the children, (7) she was left to raise her younger brothers from the time she was nine years old, (8) their mother and Lasoya fought constantly, (9) she did the cooking and cleaning for the family, (10) Lasoya regularly beat her and her brothers with a belt or paddle, (11) her brother George is bi-polar, has attempted suicide multiple times, and is institutionalized at a facility in Fredericksburg, (12) whenever the Vasquez children attempted to intervene to protect their mother, Lasoya would assault them, punching and hitting them, and kicking them with his steel-toed boots, (13) Lasoya once attempted to rape her, (14) their mother hit them with brooms, extension

---

[31] S.F. Trial, Volume 23, testimony of Diane Galindo, at pp. 75-81.

cords, and "whatever she could get her hands on," (15) petitioner is a diabetic, and (16) their mother had a stroke several years ago and is disabled.[32]

Petitioner's uncle, cousin, and sister all made emotional appeals to the jury for mercy on petitioner's behalf.[33]

    3.      Verdict

On November 10, 1999, after deliberating slightly more than two hours, petitioner's jury returned its verdict, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that constitute a continuing threat to society, (2) beyond a reasonable doubt petitioner actually caused the death of Juanita Ybarra or, if petitioner did not cause the death of Ybarra, that petitioner intended to kill Ybarra or another or anticipated that a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, and the petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[34]   Immediately after excusing the jury, the trial judge pronounced sentence in accordance with the jury's verdict.[35]

E.    Direct Appeal

---

[32] S.F. Trial, Volume 23, testimony of Mary Helen Vasquez, at pp. 85-100.

[33] S.F. Trial, Volume 23, testimony of Alfredo Fernandez, at pp. 69, 75; testimony of Diane Galindo, at pp. 82-84; testimony of Mary Helen Vasquez, at p. 97.

[34] Trial Transcript, Volume II, at pp. 313-18; S.F. Trial, Volume 24, at pp. 22-25.

[35] S.F. Trial, Volume 24, at pp. 26-27.

Petitioner appealed, presenting four points of error in his appellant's brief filed February 8, 2001, to wit, arguments that (1) the prosecution knowingly used perjured testimony regarding the date of Cruz's arrest to secure petitioner's conviction, (2) there was legally and factually insufficient evidence to corroborate the accomplice witness testimony of Cruz, (3) the trial court erred in permitting testimony concerning petitioner's gang affiliation, and (4) the trial court erred in denying petitioner's motion for continuance after it became known to petitioner's trial counsel during voir dire that Cruz would testify as an accomplice witness.

The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on February 6, 2002. *Vasquez v. State*, 67 S.W.3d 229 (Tex. Crim. App. 2002).  Petitioner did not thereafter seek certiorari review from the United States Supreme Court.

F.     State Habeas Corpus Proceeding

Petitioner filed his application for state habeas corpus relief on December 13, 2001, asserting therein seven claims for relief, including a multi-faceted ineffective assistance claim.[36]

---

[36] Petitioner's state habeas corpus application, together with  almost one hundred pages of exhibits attached thereto, appears among the pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), App. no. 71,807-01, Volume I, at pp. 4-158.

As grounds for relief in his state habeas corpus application, petitioner argued (1) the manner in which petitioner's grand jury was selected violated both Sixth Amendment Fair Cross Section principles and the Equal Protection Clause, (2) the prosecution suppressed exculpatory and impeachment evidence, (3) the prosecution knowingly used perjured testimony from prosecution witnesses Cruz and Bazan (specifically Cruz's denial of "membership" in the Mexican Mafia, Cruz's erroneous testimony regarding the date of his arrest, Bazan's denial of any knowledge that Ybarra was selling drugs, Bazan's failure to identify petitioner and Lujan as his assailants when initially questioned by police, and Bazan's testimony that he thought he broke a finger of one of his attackers) to obtain petitioner's conviction, (4) his trial counsel rendered ineffective assistance by failing to (a) adequately investigate and present exculpatory and impeachment evidence in the form of testimony from Ray Hernandez, Guadalupe Esparza, Angie Chavarria, George Martinez, Edward Guerra, Maria Garcia, Jerry Chavarria, Melissa Rodriguez, Jeff Lang, Ernest Aguillon, Brenda Monreal, Elvira Perez, and Juan Vargas, (b) challenge the prosecution's DNA evidence, (c) voir dire the entire jury

17

The state habeas trial court held an evidentiary hearing on petitioner's claims for state habeas relief on August 5, 2005 and September 30, 2005.[37]  On May 3, 2006, the parties appeared again before the state habeas trial court and agreed on the admission of voluminous, yet admittedly incomplete, lists of Bexar County grand jurors.[38]  On March 24, 2009, the state trial court issued its

---

venire on the accomplice witness rule, (d) exclude evidence showing petitioner's gang affiliation, (e) exclude evidence showing petitioner participated in a drug party the evening before the murder, and (f) object to the prosecution's closing jury argument at the punishment phase of trial describing the Texas method of lethal injection as a peaceful procedure and claiming petitioner was "perhaps the most dangerous man to ever set foot in this building," (5) petitioner was constructively denied the assistance of counsel, (6) the Texas capital sentencing special issues employ unconstitutionally vague "aggravating factors," and (7) Article 37.071 of the Texas Code of Criminal Procedure is unconstitutional.

[37] The verbatim transcription of the testimony and other evidence admitted during petitioner's evidentiary hearing in his state habeas corpus proceeding appear among the documents relating to petitioner's state habeas corpus proceeding as State Habeas Hearing Transcript, Volume I and Volume II, respectively.

[38] Supplemental State Habeas Transcript, Volume I, at pp. 24-33.  The incomplete lists of Bexar County grand jurors appear at Supplemental State Habeas Transcript, Volume I, at pp. 36-82, and at Supplemental State Habeas Transcript, Volume II, at pp. 203-313.

In addition to the admittedly incomplete lists of Bexar County grand jurors submitted to the state habeas trial court, petitioner submitted to the state habeas court the verbatim transcription from an evidentiary hearing held September 7, 2001 in Bexar County cause no. 96-CR-5238WI, *i.e.*, *Peter Dowdle v. State*.  This case represents at least the fifth time this Court has been called upon to review the transcript from the hearing in the *Dowdle* in the context of a challenge to the methods employed in Bexar County to select panels of individuals for possible service as Bexar County grand jurors. The *Dowdle* transcript appears at Supplemental State Habeas Transcript, Volume II, at pp. 314-82. The four previous cases in which this Court reviewed the same *Dowdle* transcript, and in which this Court ultimately rejected on the merits Fair Cross-section and Equal Protection challenges to Bexar county's methods for selecting panels of potential grand jurors, were *Maxwell v. Quarterman*, 2008 WL 3200672, *9-*11 (W.D. Tex. July 30, 2008), *CoA denied*, 350 Fed.Appx. 854 (5th Cir. September 18, 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1698, 176 L.Ed.2d 191 (2010); *Paredes v. Quarterman*, 2007 WL 760230, *5 (W.D. Tex. March 8, 2007), *affirmed* 574 F.3d 281 (5th Cir. 2009), *cert. denied* ___ U.S. ___, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2011); *Cervantes Salazar v. Dretke*, 393 F.Supp. 451, 479-86 (W.D. Tex. 2006), *affirmed*, 260 Fed.Appx. 643 (5th Cir. December 20, 2007), *cert. denied*, 554 U.S. 922 (2008); *Kimmel v. Dretke*, 2005 WL 1959074 (W.D. Tex. August 16, 2005), *CoA denied*, 199 Fed.Appx. 338 (5th Cir. August 29, 2006), *cert. denied*, 549 U.S. 1344 (2007).

original findings of fact, conclusions of law, and recommendation that petitioner's state habeas corpus application be denied.[39]  On August 7, 2009, the state habeas trial court issued its amended findings of fact and conclusions of law and once again recommended petitioner's state habeas corpus application be denied.[40]

In an unpublished per curiam Order, the Texas Court of Criminal Appeals accepted the state habeas trial court's recommendation (that state habeas corpus relief be denied) and adopted some, but far from all, of the state habeas trial court's amended findings and conclusions. *Ex parte Manuel Vasquez*, WR-71,807-01, 2009 WL 3842857 (Tex. Crim. November 18, 2009).

G.    Proceedings in this Court

Petitioner filed his petition for federal habeas corpus relief in this Court on November 12, 2010, asserting seven claims which mirror the claims petitioner asserted in his state habeas corpus application. *Docket entry no. 13.*  Respondent filed his answer on September 9, 2011. *Docket entry no. 18.*  Petitioner filed his reply to respondent's answer on December 21, 2011. *Docket entry no. 21.*

## II. AEDPA Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any

---

[39] State Habeas Transcript, Volume I, at pp, 240-80.  For unknown reasons, the original findings identified the complaint as "David Cook," the victim of Anthony Bartee in an unrelated Bexar County capital murder.

[40] State Habeas Transcript, Volume II, at pp. 1-42.

claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S.

at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  A federal court making the "unreasonable

application" inquiry should ask whether the state court's application of clearly established federal

law was "objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, ___, 130 S.Ct. 665, 673

(2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable

application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that

law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21.  The focus of this inquiry

is on whether the state court's application of clearly established federal law was objectively

unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v.

Landrigan*, 550 U.S. 465, 473 (2007)("The question under the AEDPA is not whether a federal court

believes the state court's determination was incorrect but whether that determination was

unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v.

Vincent*, 538 U.S. 634, 641 (2003)("it is the habeas applicant's burden to show that the state court

applied that case to the facts of his case in an objectively unreasonable manner").

> As the Supreme Court has recently explained:
>
> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a
> writ of habeas corpus from a federal court "must show that the state court's ruling on
> the claim being presented in federal court was so lacking in justification that there
> was an error well understood and comprehended in existing law beyond any
> possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S.Ct. 26, 27 (2011)(quoting *Harrington v. Richter,* 562 U.S.
___, ___, 131 S.Ct. 770, 786–87 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings,

as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision

establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004)("We look for 'the

governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, ___ U.S. ___, ___, 130 S.Ct. 841, 849 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240  (2005)("[W]e

22

presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010)(federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, ___ U.S. ___, 132 S.Ct. 124 (2011); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007).

### III. Challenges to the Grand Jury

A.     The Claims

In his first ground for federal habeas corpus relief herein, petitioner argues the fact only approximately twenty-five percent of the Bexar County grand jurors who indicted petitioner for capital murder had surnames which petitioner considers to be "Hispanic" means petitioner's rights

under the Sixth Amendment's Fair Cross-Section requirement and the Fourteenth Amendment's Equal Protection Clause were violated.[41]

B.      State Court Disposition

Petitioner presented the same arguments as his first ground for relief in his state habeas corpus application.[42]

The state habeas trial court made, and the Texas Court of Criminal Appeals expressly adopted, findings that there was no evidence presented during petitioner's state habeas corpus proceeding showing either (1) the ethnic composition of registered voters in Bexar County, Texas, (2) the ethnic composition of venires or panels from which those actually serving as Bexar County grand jurors were selected, (3) appearance rates among prospective grand jurors, claims for excuses or exemptions, or other factors affecting eligibility of prospective grand jurors, or (4) Hispanics are systematically under-represented on the venires, panels, or pools from which Bexar County grand jurors have been selected or that any under-representation is the result of the jury selection process.[43]

In addition, the state habeas trial court made, and the Texas Court of Criminal adopted, findings that (1) Bexar County grand juries are selected by one of two methods - "wheel" or "commissioner/key man," (2) under the "wheel" system, grand juries are drawn from venires or panels of approximately seventy-five prospective grand jurors, (3) those selected by the commissioner method are drawn from a panel of twenty prospective grand jurors, (4) at any one time

_____

[41] Petitioner's federal habeas corpus petition, filed November 12, 2010, docket entry no. 13 (henceforth "Petition"), at pp. 11-25.

[42] State Habeas Transcript, Volume I, at pp. 8-26.

[43] State Habeas Transcript, Volume II, at pp. 3-4, 6.

there are two grand juries impaneled in Bexar County, (5) the duty to impanel a grand jury rotates among the Bexar County district courts that dispose of criminal cases by numbered order, (6) indictments are returned to district courts by a system of numerical rotation, (7) the pool of potential jurors maintained for the "wheel" consisted of registered voters of Bexar County throughout most of the period for which records were made available to the court by petitioner's counsel and the State, (8) the names of prospective jurors who had a valid driver's license or personal identification cards or certificates, but were not registered to vote, were added to the wheel in September, 2000 (i.e., following petitioner's indictment), and (9) the use of surnames alone to identify the ethnicity of grand jurors is "highly problematical."[44]

The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that (1) the use of voter registration lists have been upheld to be racially neutral and sufficiently representative to pass constitutional muster, (2) the key man/commissioner system is not per se unconstitutional, and (3) the wheel system, as used in Bexar County, is not calculated to exclude any identifiable group of individuals contained in the pool of potential voters.[45]

The Texas Court of Criminal Appeals rejected on the merits petitioner's fair cross-section and equal protection challenges to Bexar County's methods of selecting potential grand jurors. *Ex parte Manuel Vasquez*, 2009 WL 3842857, *1 (Tex, Crim. App. November 18, 2009).

C.      Overview of the Claims

---

[44] *Id.*, at pp. 2-3.

[45] *Id.*, at pp. 5-6.

There are at least three very significant analytical problems with petitioner's statistically-based challenges to the methods employed in Bexar County to select grand jurors.

First, as this Court pointed out when it rejected several previous challenges to Bexar County's methods for selecting potential grand jurors, petitioner has failed to furnish the state courts, or this Court, with any hard data showing the percentage of Bexar County's population *eligible to vote* who are Hispanic in ethnicity. The Fifth Circuit has made clear that, for purposes of equal protection analysis, the relevant "community" consists of those individuals who were *eligible* to serve as jurors in the jurisdiction in question. *See United States v. Williams,* 264 F.3d 561, 568 (5th Cir. 2001)(holding the relevant community consisted of those individuals who were eligible to serve as jurors in the District). This Court has held the same. *See Sosa v. Dretke*, 2004 WL 1124949, *38-*39 (W.D. Tex. May 20, 2004)(holding a petitioner who failed to present hard data indicating the percentage of an identifiable group *eligible to vote* within a Texas county failed to establish a prima facie case under either equal protection of fair cross-section principles), *CoA denied,* 133 Fed.Appx. 114 (5th Cir. May 31, 2005)*, cert. denied*, 546 U.S. 1004 (2005). This Court has explained previously that reliance upon the proportion of the overall population of Bexar County that is Hispanic in ethnicity is of little utility when attempting to evaluate the merits of either a fair cross-section or equal protection challenge to grand juror selection. *See Maxwell v. Quarterman*, 2008 WL 3200672, *11 (W.D. Tex. July 30, 2008)(citing petitioner's failure to identify the percentage of Bexar County's adult population as a basis for rejecting a fair cross-section claim), *CoA denied*, 350 Fed.Appx. 854 (5th Cir. September 18, 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1698 (2010); *Cervantes Salazar v. Dretke*, 393 F.Supp.2d 451, 481-82 (W.D. Tex. 2006)(once more faulting a petitioner's failure to furnish statistical information regarding the Hispanic portion of Bexar

County's adult population in denying fair cross-section and equal protection challenges to Bexar County grand jury selection methods), *affirmed*, 260 Fed.Appx. 643 (5th Cir. December 20, 2007), *cert. denied*, 554 U.S. 922 (2008).

Second, petitioner failed to present the state habeas court, and has failed to present this Court, with any hard data showing the actual ethnicity of those individuals called as *prospective* Bexar County grand jurors under either the wheel or commission system. Instead, petitioner furnished the state habeas court, and has furnished this Court, with what petitioner's counsel candidly acknowledges to be an incomplete list of the names of persons who *actually served* as Bexar County grand jurors from 1990 through 2000.[46] As will be explained in more detail hereinafter, for purposes of determining whether an identifiable group has been under-represented as a result of alleged deficiencies in the jury selection process (in comparison to that same group's appearance among those eligible to vote in a community) under both Sixth Amendment fair cross-section analysis and Fourteenth Amendment equal protection analysis, the relevant inquiry is the percentage of members of said group who appear among those persons called to serve as potential or prospective jurors on the panels, pools, or venire from which jurors were selected, not the percentage of that group who actually served as jurors. There may be any number of wholly racially neural reasons why persons summoned to jury duty may be excused or exempted from jury duty once called to do so. The Supreme Court has repeatedly refused to extend the Sixth Amendment's fair cross-section requirement to the selection of a petit jury once a jury panel or venire has been constituted that satisfies this requirement. *See Holland v. Illinois,* 493 U.S. 474, 486-87 (1990)(holding the Sixth

---

[46] Petition, at pp. 12-13 (explaining there are no records of *prospective* grand jurors available for calendar year 1998 and furnishing a table purporting to list the number of persons with "Hispanic surnames" who actually served on Bexar County grand juries from 1990 through 2000).

Amendment's fair cross-section requirement does not mirror the Equal Protection Clause's proscription against racial discrimination in the exercise of peremptory challenges); *Teague v. Lane,* 489 U.S. 288, 314-15 (1989)(recognizing the denial of the right to a fair cross-section of the community in a jury venire does not undermine the fundamental fairness that must underlie a criminal conviction); *Lockhart v. McCree,* 476 U.S. 162, 173 (1986) ("We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").  Thus, petitioner's Sixth and Fourteenth Amendment arguments premised solely upon the ethnicity of those who actually served as Bexar County grand jurors are non sequitur.

Third, petitioner's reliance upon what petitioner subjectively perceives as an individual's "Hispanic surname" as the sole criteria for determining an individual's ethnicity is fallacious.[47] Absent some objectively definable basis for identifying a particular name as "Hispanic," petitioner's reliance on statistics generated by petitioner's wholly subjective perception of a particular surname as "Hispanic" furnishes no reliable evidence of the ethnicity of a particular individual or group of individuals.[48]  Petitioner does not offer any objective criteria for determining whether a particular

---

[47] *Cervantes Salazar v. Dretke*, 393 F.Supp.2d at 481 n.69:
The "inexactness" of using surnames as the lone determinant of ethnicity is magnified greatly in a community as cosmopolitan as Bexar County. More significantly, petitioner offered the state habeas court, and offers this Court, no explanation of precisely what petitioner considers an "Hispanic" surname, as opposed to a non-Hispanic surname.  Nor did petitioner offer the state habeas court any objective criteria which could be used to ascertain which surnames fell within petitioner's perception of the term "Hispanic."

[48] *Paredes v. Quarterman*, 2007 WL 760230, *5 (W.D. Tex. March 8, 2007)(pointing out the lack fo congruence between persons bearing "Hispanic" surnames and true measures of ethnicity),

surname is, or is not, "Hispanic."  The law professor called by petitioner's federal habeas counsel herein to testify during the *Dowdle* hearing, which hearing transcript is a part of the state habeas record herein, testified without contradiction that he did not believe it was possible to ascertain a Bexar County juror's ethnicity based solely upon the juror's surname.[49]  Thus, petitioner failed to present the state habeas court, and has failed to present this Court, with any hard data establishing the ethnicity of actual Bexar County grand jurors, much less the ethnic breakdown of those persons called to serve on panels, pools, or venire from which Bexar County grand jurors were selected.

D.     Fair Cross-Section Requirement

1.     *Teague* Foreclosure

As this Court has pointed out on numerous occasions, while the Fifth Circuit has applied the Sixth Amendment's fair cross-section requirement to the selection of state *grand* juries, the United States Supreme Court has consistently refused to do likewise. *Maxwell v. Quarterman*, 2008 WL 3200672, *11; *Paredes v. Quarterman*, 2007 WL 760230, *5; *Kimmel v. Dretke*, 2005 WL 1959074, *6 (W.D. Tex. Aug. 16, 2005), *CoA denied*, 199 Fed.Appx. 338 (5th Cir. Aug. 29, 2006), *cert. denied*, 549 U.S. 1344 (2007); *Cervantes Salazar v. Dretke*, 393 F.Supp.2d at 483-85.  Thus, extension of the Sixth Amendment's fair cross-section requirement to state *grand* juries is foreclosed by the non-retroactivity principle announced in *Teague v. Lane*, 489 U.S. 288 (1989).

---

*aff'd* , 574 F.3d 281 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1050 (2011); *Cervantes Salazar v. Dretke*, 393 F.Supp.2d 451, 481 (W.D. Tex. 2005)(rejecting a petitioner's reliance upon his own subjective perception of the "Hispanic" or "non-Hispanic" nature of grand jurors' surnames as the exclusive determinant of their ethnicity), *aff'd* , 260 Fed.Appx. 643 (5th Cir. Dec. 20, 2007), *cert. denied*, 554 U.S. 922 (2008).

[49] Supplemental State Habeas Transcript, Volume II, at pp. 333-34 (wherein St, Mary's Law School Professor and veteran Bexar County criminal defense counsel Mark Stevens testified he did not believe it was possible to ascertain the ethnicity of a juror from that juror's surname).

2.      Clearly Established Federal Law

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the *representation of this group in venires from which the juries are selected* is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979)(*Emphasis added*). *Accord Berghuis v. Smith*, ___ U.S. ___, ___, 130 S.Ct. 1382, 1388, 1392 (2010)(affirming the continuing vitality of the *Duren* standard).

3.      AEDPA Analysis

Because the Supreme Court has not yet extended the Sixth Amendment's fair cross-section principle to the selection of state *grand* juries, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's fair cross-section claim was not contrary to clearly established federal law.

Furthermore, as was explained in Section III.C. above, petitioner failed to present the state habeas court with any evidence showing that persons of Hispanic ethnicity were under-represented among the panels, pools, and venires from which Bexar County grand jurors were selected. Petitioner's attempt to rely upon the frequency of persons possessing what petitioner subjectively believed to be "Hispanic" surnames among those who actually served on Bexar County grand juries did not begin to satisfy the second requirement for a prima facie fair-cross-section claim under *Duren*. *See Paredes v. Quarterman*, 574 F.3d 281, 290 (5th Cir. 2009)(holding a petitioner who, like petitioner herein, fails to present any data on the ratio of Hispanics to non-Hispanics on the lists from which grand jurors were chosen and, instead, provides only evidence pertaining to the composition of actual grand jury panels, furnishes data that is irrelevant to the Sixth Amendment inquiry.), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1050 (2011).  Likewise, petitioner presented the state habeas court

30

with no evidence showing Hispanics were "systematically excluded" from service on Bexar County grand juries.  Petitioner failed to present the state habeas court with a prima facie case under the Sixth Amendment's fair cross-section requirement.

E.      Equal Protection Claim

      1.      Clearly Established Federal Law

Few principles of federal constitutional law have been more consistently and uniformly applied over time than the Supreme Court's pronouncement in *Strauder v. West Virginia*, 100 U.S. 303, 307-10 (1879), that excluding otherwise qualified persons from service on grand juries solely on the basis of their race violates the equal protection guarantee of the Fourteenth Amendment. *See Vasquez v. Hillery*, 474 U.S. 254, 261-62 (1986)(recognizing that indictment of a criminal defendant by a grand jury from which members of a racial group purposefully have been excluded violates the defendant's right to equal protection of the laws); *Rose v. Mitchell*, 443 U.S. 545, 556 (1979) (because discrimination on the basis of race in selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole," indictment by a grand jury from which members of a racial group purposefully have been excluded violates equal protection principles).

To be entitled to federal habeas relief based on a claim of discriminatory selection of grand jurors, i.e., an equal protection violation, the petitioner must show the procedure employed "resulted in substantial under-representation" of the members of a race or another identifiable group. *Rose v. Mitchell*, 443 U.S. at 565, 99 S.Ct. at 3005; *Castaneda v. Partida*, 430 U.S. at 494.  Thus, first, the petitioner must establish the excluded group is a recognizable, distinct class singled out for different treatment under state law, as written, or as applied. *Rose v. Mitchell*, 443 U.S. at 565; *Castaneda v. Partida*, 430 U.S. at 494.  Second, the petitioner must establish the degree of under-representation

31

was *substantial*, usually by comparing the proportion of the group in the total population to the

proportion *called to serve as grand jurors over a significant period of time*. *Rose v. Mitchell*, 443

U.S. at 565; *Castaneda v. Partida*, 430 U.S. at 494.

> The first step is to establish that the group is one that is a recognizable, distinct
> class, singled out for different treatment under the laws, as written or as applied....
> Next, the degree of underrepresentation must be proved, by comparing the
> proportion of the group in the total population to the proportion called to serve as
> [foreman], over a significant period of time....  This method of proof, sometimes
> called the 'rule of exclusion,' has been held to be available as a method of proving
> discrimination in jury selection against a delineated class....  Finally...a selection
> procedure that is susceptible of abuse or is not racially neutral supports the
> presumption of discrimination raised by the statistical showing.

*Rose v. Mitchell*, 443 U.S. at 565.

2.      AEDPA Analysis

As was explained in Section III.C. above, petitioner failed to present the state court with

any evidence showing the percentage of Hispanics *eligible to vote* in Bexar County was greater

than the percentage of Hispanics called to serve on the panels, pools, and venires from which

Bexar County grand jurors were selected.   Petitioner presented the state habeas court with no

evidence establishing the ethnic composition of the panels, venires, or pools from which Bexar

County grand jurors were selected during the relevant time frame.  Petitioner's comparison of the

percentage of Hispanics in the total population of Bexar County with the percentage of persons

with Hispanic surnames who actually served on Bexar County grand juries from 1990 through

2000 is constitutionally irrelevant for equal protection purposes and does not satisfy the second

prong of the *Rose* test. *United States v. Williams,* 264 F.3d at 568 (the relevant community

consisted of those individuals eligible to serve as jurors in the District).  Petitioner failed to

present the state habeas court with a prima facie case showing an equal protection violation relating to Bexar County's methods for selecting grand jurors.

For more than a quarter century, the Fifth Circuit has consistently rejected equal protection and fair cross-section complaints arising from alleged under-representation of various minority groups on voter registration lists used to select grand and petit jury venires. *See, e.g., Soria v. Johnson,* 207 F.3d 232, 249 (5th Cir.)("the fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore underrepresented [sic] on jury panels presents no constitutional issue"), *cert. denied*, 530 U.S. 1286 (2000); *United States v. Brummitt,* 665 F.2d 521, 527 (5th Cir. 1981) (holding the same), *cert. denied,* 456 U.S. 977 (1982); *United States v. Goff,* 509 F.2d 825, 826-27 (5th Cir. 1975)(upholding the use of voter registration lists to select jurors), *cert. denied,* 423 U.S. 857 (1975).

F.      Conclusions

Petitioner's fair cross-section claim is foreclosed by *Teague.*  The Texas Court of Criminal Appeals' rejections on the merits, in the course of petitioner's state habeas corpus proceeding, of petitioner's fair cross-section and equal protection challenges to the methods employed to select Bexar County grand juries were neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during petitioner's state habeas corpus proceeding.  Petitioner's first claim herein does not warrant federal habeas corpus relief.

IV. *Brady* Claims

A.      The Claims

33

In his second claim herein, petitioner argues (1) prosecution witness Bazan gave conflicting testimony (and conflicting statements to police) regarding the details of the assaults upon him and Ybarra, (2) Bazan gave trial testimony that he was unaware of Ybarra's illicit drug sales despite Bazan's prior statements to police admitting he was aware of Ybarra's drug sales, (3) Bazan initially failed to identify petitioner and Lujan as participants in the assault upon him, (4) police and prosecutors interviewed witnesses Edward Guerra, Melissa Rodriguez, and Maria Augustina Garcia prior to trial but failed to disclose to petitioner's trial counsel that these witnesses all claimed petitioner was not present at the motel the evening before the murder, and (5) prosecutors never informed petitioner's trial counsel that Bazan claimed to make broken a finger of one of his assailants.[50]  Based upon the foregoing, petitioner argues his constitutional rights were violated in contravention of the Supreme Court's holdings in *Brady v. Maryland*, 373 U.S. 83, 87 (1963)(holding suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution).

B.    State Court Disposition

Petitioner fairly presented essentially the same claim for relief as his second ground for state habeas corpus relief.[51]  In connection with petitioner's *Brady* claim, the state habeas trial

---

[50] Petition, at pp. 25-35.

[51] State Habeas Transcript, Volume I, at pp. 26-35.
During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner's state habeas counsel called one of petitioner's prosecutors, Mary Green, who identified four sets of notes she had taken while interviewing Moses Bazan, Edward Guerra, someone named "Michelle" and someone named "Augustina." S.F. State Habeas Hearing, Volume I, testimony of Mary Green, at pp. 64-72.  Curiously, however, petitioner never asked prosecutor Green if the information contained in her interview notes had ever been transmitted to petitioner's defense team

court made, and the Texas Court of Criminal Appeals adopted, findings that (1) petitioner's co-counsel at trial, attorney Joel Perez, testified he reviewed the prosecution's file, (2) Perez also testified he was almost sure he had not been told Bazan claimed to have broken a finger of one of his assailants, (3) Perez testified he reviewed multiple statements given by Bazan and was able to employ inconsistencies therein to impeach Bazan at trial, (4) neither Edward Guerra nor Melissa Rodriguez testified at petitioner's trial or state habeas hearing, and (5) petitioner's other co-counsel at trial, attorney Wendellyn K. Rush, did not testify at petitioner's state habeas hearing.[52] The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that (1) because petitioner failed to call and question his trial co-counsel, attorney Rush, regarding precisely what information the prosecution conveyed to the petitioner's defense team, petitioner failed to establish that any of the alleged impeachment evidence identified by petitioner had been withheld by the prosecution, (2) petitioner's other co-counsel at trial, attorney Perez, was unable to identify any evidence allegedly withheld, other than Bazan's claim that he believed he had broken a finger of one of his assailants, (3) petitioner's defense team was aware Bazan had made multiple statements which included many inconsistencies and employed same to cross-examine and impeach Bazan at trial, (4) petitioner's defense team could, through the exercise of reasonable diligence, have identified and interviewed all persons who were at the New Laredo Motel the evening before the murder, (5) any alleged failure to disclose Bazan's claim that he had broken a finger of one of his assailants did not violate the rule in *Brady*, (6) Bazan's material testimony (concerning petitioner's murder of Ybarra) was corroborated by the

---

prior to trial. *Id.*

[52] State Habeas Transcript, Volume II, at pp. 7-8.

trial testimony of Cruz, (7) numerous witnesses placed petitioner at the New Laredo Motel in the hours immediately before Ybarra's murder, and (8) the allegedly withheld, additional, impeachment evidence (in the form of Bazan's prior inconsistent statements and the affidavits of Guerra, Melissa Rodriguez, and Maria Garcia) was not material to the outcome of petitioner's trial.[53]  The Texas Court of Criminal Appeals rejected petitioner's *Brady* claim on the merits. *Ex parte Manuel Vasquez*, WR-71,807-01, 2009 WL 3842857, *1.

C.    Clearly Established Federal Law

Few constitutional principles are more firmly established by Supreme Court precedent than the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).  This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 & 685 (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  "[T]he individual prosecutor has a duty to learn of any favorable

---

[53] State Habeas Transcript, Volume II, at pp. 9-12.

evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281*(Emphasis added*); *Kyles v. Whitley*, 514 U.S. at 437.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. at 281-82.  Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Smith v. Cain*, ___ U.S. ___, ___, 132 S.Ct. 627, 630 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks v. Dretke*, 540 U.S. at 698-99.  A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith v. Cain*, ___ U.S. at ___, 132 S.Ct. at 630; *Kyles v. Whitley*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry.  First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*).  Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434-35.  Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435-36.

37

Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at 436-37.

D.      AEDPA Review

        1.      No Showing of "Suppression"

As pointed out by the state habeas trial court in its findings and conclusions, the fundamental problem with petitioner's *Brady* claim is that petitioner failed to present the state habeas court with any evidence showing precisely what information prosecution made available to petitioner's defense team and what information, if any, was actually withheld by the prosecution from petitioner's defense team.

        The state trial court appointed attorney Jacqueline Snyder to represent petitioner on May 7, 1998.[54]  On May 16, the trial court appointed an investigator to assist the defense team.[55]  On January 21, 1999, the trial court appointed a substitute investigator to replace petitioner's original court-appointed investigator.[56]  On February 22, 1999, the trial court appointed attorney Wendellyn K. Rush as co-counsel for petitioner.[57]

        On September 15, 1999, the trial court held a hearing on attorney Snyder's motion to withdraw as counsel of record for petitioner because of a conflict of interest that had arisen from her then-recent appointment in federal court to represent petitioner's fellow Mexican Mafia member George Martinez in connection with a massive drug trafficking and conspiracy case and

---

[54] Trial Transcript, Volume I, at p. 3.

[55] Trial Transcript, Volume I, at p. 8.

[56] Trial Transcript, Volume I, at p. 99.

[57] Trial Transcript, Volume I, at p. 104.

the fact the prosecution in petitioner's state court capital murder case had issued a subpoena for Martinez.[58]  The trial court granted attorney Snyder's motion to withdraw.[59]  The state trial court appointed attorney Joel Perez to replace attorney Snyder as first chair counsel for petitioner.  The voir dire portion of Petitioner's trial commenced on September 16, 1999.

At the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner called attorney Perez who testified, in pertinent part, that (1) he did not personally interview potential witnesses George Martinez, Angie Chavarria, Guadalupe Esparza, Jerry Chavarria, Juan Vargas, Ernest Aguillon, or Jeff Lang because the defense team had a court-appointed investigator, (2) a police detective's notes indicated that persons staying in room 21 heard glass breaking around 8:30 a.m. the morning of the murder, (3) the New Laredo Motel was a run down facility used by vagrants, transients, dope dealers, and the like, (4) the defense team had trouble finding people who were staying at the motel on the date of the murder, (5) the hotel owner's wife stated the people in room 16 checked out around 7:45 a.m., (5) the prosecution had an open file policy and he reviewed the prosecution's case file, (6) he did not recall seeing the prosecutor's interview notes in the case file, (7) he did not recall seeing Cruz's BCADC records in the case file, (8) he did not recall being informed that Bazan had said he had seen Cruz holding a knife, (9) he did not recall hearing Bazan say that Lujan stabbed Bazan, (10) he knew Cruz's affiliation with the Mexican Mafia was confirmed, (11) the defense presented an alibi defense at trial because the alibi testimony of Mercedes Villarreal was consistent with what the petitioner

---

[58] S.F. Trial, Volume 4, at pp. 3-55.  Significantly, during that hearing, attorney Snyder testified she believed Martinez would hurt petitioner "profoundly" if Martinez were called to testify during petitioner's capital murder trial. *Id.*, at p. 12.

[59] S.F. Trial, Volume 4, at p. 51.

told the defense team, (12) Mercedes Villarreal was a better witness than petitioner's other acquaintances because Villarreal had no drug history, appeared credible, and her testimony was going to hurt her marriage and because petitioner's other acquaintances had apparently conspired to hide bloody clothing shortly after the murder, (13) the statements of petitioner's other acquaintances were inconsistent with the alibi testimony of Mercedes Villarreal, (14) he was able to attack and exploit inconsistencies in the testimony of Moses Bazan and inconsistencies between Bazan's trial testimony (which was "jittery" on direct) and Bazan's prior statements to police, and (15) he could not testify as to the actions taken by his co-counsel Rush or the defense team's court-appointed investigator.[60]

Significantly, petitioner did not call his co-counsel at trial, attorney Rush, or either of his court-appointed investigators to inquire as to what information they received from the prosecution or obtained through the defense team's pretrial investigation regarding either (1) Moses Bazan's pretrial statements to police or prosecutors, (2) the identities of the persons whom

---

[60] Statement of Facts from the evidentiary hearing held in petitioner's state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing"), Volume I, testimony of Joel Perez, at pp. 74-75, 80-82, 85-86, 88, 90-91, 93, 100-01, 103-07, 111.

Petitioner attached to his state habeas corpus application several statements executed by Moses Bazan, including exhibits D, F, and S. State Habeas Transcript, Volume I, at pp. 78-79, 91-94, 132-36. Given the nature of attorney Perez's cross-examination of Bazan at trial, it is highly likely attorney Bazan had reviewed these statements prior to trial.

At the evidentiary hearing held in petitioner's state habeas corpus proceeding, attorney Perez never denied having seen any of the interview notes identified as Exhibits S, T, U, or V that had been attached to petitioner's state habeas corpus application. In fact, Perez testified, in pertinent part, that (1) he did not recall having been told by prosecutors that Bazan claimed to have broken the pinky finger of one of his assailants, (2) he did not recall being told by prosecutors that Bazan claimed both Cruz and Lujan had stabbed him, (3) the prosecutor had an open file policy, (4) he reviewed the prosecutor's file, (5) it was rare to see the prosecutor's notes in a case file, (6) his trial strategy was to attack inconsistencies in Bazan's statements and to challenge Bazan's memory, and (7) he believed he had impeached Bazan based upon inconsistencies in Bazan's statements. S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at pp. 79-83, 100-01, 106-07.

the defense team interviewed prior to trial, or (3) the information, if any, imparted to the defense team by the persons the defense team interviewed prior to trial.  Petitioner also failed to call his former first chair counsel, attorney Jacqueline Snyder (who represented petitioner from May, 1998 until September, 1999), and to inquire as to what information she obtained from the prosecution or through the defense team's pretrial interviews with potential witnesses.  That attorney Perez, who joined the defense team only days before the commencement of voir dire, was personally unaware of Bazan's assertion that he broke the pinky finger of one of his assailants does not, standing alone, establish the entire defense team was never made aware of Bazan's assertion to that effect by the prosecution.  Under these circumstances, it is far from clear precisely what information petitioner's defense team possessed at the time of petitioner's trial.  Thus, petitioner has failed to establish the defense team was unaware of (or that the prosecution actually withheld) any of the allegedly "new" impeachment evidence petitioner now claims was "withheld" from the defense team by the prosecution.  Given attorney Perez's testimony that he reviewed the prosecution's file and the substance of his cross-examination of Moses Bazan at petitioner's trial, it seems apparent attorney Perez had likely seen Bazan's written statements to police dated March 19, 1998 and March 26, 1998 prior to the start of petitioner's capital murder trial.

The state habeas trial court correctly concluded that there is no general right to discovery in criminal cases and *Brady* did not create such a right. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *Wooten v. Thaler*, 598 F.3d 215, 219 (5th Cir.), *cert. denied*, ___ U.S. ___, 131 S.Ct. 294 (2010).  The Constitution does not require the prosecutor to share all useful information with the defendant. *United States v. Ruiz*, 536 U.S. 622, 629 (2002).  Information readily discoverable to a

criminal defendant through the exercise of due diligence, such as pretrial interviews of witnesses identifiable through review of police reports, is not "suppressed" or "withheld" within the meaning of *Brady*. *See United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011)(to have been "suppressed," the evidence must not have been discoverable through the defendant's due diligence), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1969 (2012); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.)(the defendant must prove that the prosecution suppressed favorable, material evidence that was not discoverable through due diligence), *cert. denied*, 536 U.S. 978 (2002). Petitioner has failed to allege any specific facts, much less furnish any evidence, establishing any of the "new" evidence identified by petitioner in his second claim herein was either actually unknown to petitioner's defense team at the time of trial or unavailable despite the exercise of due diligence on the part of petitioner's defense team.[61]

2.    No Showing of "Materiality"

a.    Impeachment of Moses Bazan

At trial, Bazan testified in great detail concerning the vicious beating he received at the hands of Cruz and Lujan, including detailing (1) Cruz's efforts to choke Bazan with an extension cord while Lujan choked Bazan with his hands and the three men fought violently, (2) Cruz's and

_____

[61] Furthermore, the record before the state habeas court included Exhibit W to petitioner's state habeas corpus application,. i.e., a letter dated October 12, 1999 from prosecutor Mary T. Green to petitioner's lead trial counsel Joel Perez, in which prosecutor Green advises attorney Perez (1) Moses Bazan had informed the prosecution he believed his assailants wore coverings "like pantyhose" over their faces but those were removed during the ensuing struggle, (2) prosecution witness Amalia Garcia informed prosecutors she saw the three defendants put bandanas and towels around their faces prior to leaving room 20 on the night of the murder, and (3) the names Adrian and Sandra used by several persons who gave police statements were apparently fictitious and the witnesses who used those names had been instructed to use those false names and not to mention petitioner's name. State Habeas Transcript, Volume I, at p. 150.

Lujan's stabbings of Bazan, and (3) the difficulty Bazan had remembering the specific details of the assault upon him.[62]  Bazan also testified, without contradiction that (1) he had difficulty breathing after the assault because of broken ribs he sustained, (2) he had also suffered cuts to his face and head which required sutures and staples, (3) he was taken to the hospital for treatment of his injuries, and (4) it took him about three weeks to recover from the assault upon him.[63]

Cruz testified at great length concerning his own, Lujan's, and petitioner's assaults upon Bazan.[64]  Cruz testified that, after a violent fight, he and Lujan managed to knock Bazan out temporarily and, when Bazan regained consciousness, Lujan resumed his assault upon Bazan.[65]  Cruz also testified, without contradiction, that petitioner struck Bazan on the head several times with a handgun, the trigger guard of the gun broke, and petitioner continued to strike Bazan, thereby cutting Bazan.[66]  Police officers who arrived at the scene that morning described Bazan as having been hurt badly, bloody, barely able to speak, and disoriented.[67]

---

[62] S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 123-33, 154-55, 160-63.

[63] *Id.*, at pp. 138-40.

[64] S.F. Trial, Volume 18, testimony of Johnny Joe Cruz, at pp. 44-51.

[65] *Id.*, at pp. 45-49.

[66] *Id.*, at pp. 50-51.

[67] S.F. Trial, Volume 19, testimony of Jose Bara,, at pp. 11-13; testimony of Robert Rosales, at pp. 21-22.
Officer Bara also testified Bazan refused to say who had attacked him. S.F. trial, Volume 19, testimony of Jose Bara, at pp. 13, 19.  Officer Rosales also testified (1) petitioner had been severely beaten about the face and head, (2) a wire and cloth were around Bazan's ankles, and (3) a restraint, consisting of a wire and tee shirt, was around Bazan's neck. S.F. Trial, Volume 19, testimony of Robert Rosales, at pp. 21-22.

Under such circumstances, it is hardly surprising Bazan testified (1) the entire melee was confusing, (2) it was difficult for him to recall which of his assailants delivered specific blows to him, and (3) it felt to him at times as if more than two people were fighting him.[68]  Bazan also candidly admitted he used cocaine the evening before the murder.[69]  It is hardly surprising, therefore, that there were inconsistencies within Bazan's trial testimony concerning the details of the assaults upon him and Ybarra and between Bazan's pretrial statements to police and his trial testimony, many of which petitioner's trial counsel pointed out during cross-examination of Bazan.

Petitioner's trial counsel attempted to impeach Bazan's testimony on direct by obtaining admissions and concessions from Bazan on cross-examination that (1) Bazan initially identified only Cruz and three other unidentified persons as his assailants, (2) even at trial, he remained uncertain whether there had been a fourth assailant in the motel room beating him, (3) he never saw anyone strangle Ybarra (in contrast to his testimony on direct that he saw petitioner attempt to "choke" Ybarra),[70] (4) he told police Cruz beat both himself and Ybarra, and (5) initially he

---

[68] S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 161-63.

[69] *Id.*, at pp. 108, 148.

[70] Petitioner did not call Bazan to testify during the evidentiary hearing held in petitioner's state habeas corpus proceeding.  Petitioner did not elicit any testimony from his trial lead counsel, attorney Perez, establishing that said counsel was surprised at trial by any of Bazan's testimony. Likewise, petitioner did not elicit from the one prosecutor who did testify at petitioner's state habeas corpus hearing that Bazan ever gave prosecutors any information that was materially inconsistent with the testimony Bazan gave petitioner's jury at trial.

believed his assailants wore pantyhose masks.[71]  Petitioner's trial counsel obtained a concession from Bazan that he did not know who had strangled Ybarra.[72]

Petitioner points to handwritten notes dated August 17, 1999 attached to petitioner's state habeas corpus application as Exhibit S which read in part "he broke guy's pinky finger."[73] Petitioner argues this was some sort of "new" information which was never disclosed to petitioner's defense team.[74]  However, Bazan's statement given to police on March 26, 1998, and attached to petitioner's state habeas corpus application as Exhibit F thereto, states in pertinent part "I reached back and got one of the guys by his pinky finger and I bent it back as far as I could."[75]  Thus, petitioner's trial counsel were familiar, in all reasonable likelihood, with the Bazan's assertion that he had injured one of his assailants' pinky fingers.

There is no evidence before this Court, and there was no evidence before the state habeas court, showing petitioner's defense team was unaware of the contents of Bazan's multiple written statements to police.  On the contrary, petitioner's trial counsel cross-examined Bazan, in part, based upon several different statements Bazan had apparently given to police and even oral statements Bazan had made to hospital personnel.[76]

---

[71]  S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 143-58.  On re-direct examination, Bazan candidly admitted he remained uncertain as to whether there had been a fourth assailant, a point he reiterated upon re-cross-examination. *Id.*, at pp. 161-65.

[72]  *Id.*, at pp. 145-46.

[73]  State Habeas Transcript, Volume I, at p. 135.

[74]  Petition, at p. 32.

[75]  State Habeas Transcript, Volume I, at p. 92.

[76]  *Id.*, at pp. 143-45, 147-48 (referring to Bazan's second statement given March 26, 1998), 151, 154 (referring to Bazan's March 26, 1998 statement), 156.

Petitioner argues in his second claims herein that additional impeachment evidence in the possession of the prosecution showed Bazan knew Ybarra was selling drugs from room 15 of the New Laredo Motel, allegedly in contrast to Bazan's trial testimony.  Bazan testified on cross-examination that he had no knowledge Ybarra was selling drugs out of the motel room they shared.[77]  However, previously, Bazan's trial testimony on direct examination had been that (1) while he did not know if Ybarra had been selling drugs, he had heard "some people" say that she did and (2) he would not be surprised to learn Ybarra had sold drugs.[78]  Thus, even if Bazan had previously told prosecutors he knew Ybarra was selling drugs, a point which petitioner failed to establish during the evidentiary hearing in his state habeas corpus proceeding, that admission by Bazan would have held little impeachment value.

Contrary to the suggestions implicit in petitioner's second claims herein, petitioner did not call Bazan to testify during the evidentiary hearing held in petitioner's state habeas corpus proceeding and did not elicit any testimony from the one prosecutor petitioner did call to testify during that hearing which established that Bazan ever told prosecutors he did not see petitioner punch Ybarra.[79]  Cryptic notes stating what Bazan may have *heard* while he was being assaulted

---

[77] *Id.*, at p. 144.

[78] *Id.*, at pp. 103-04.

[79] Petitioner's exhibit S attached to petitioner's state habeas corpus application, identified during petitioner's state habeas hearing as notes taken by prosecutor Green during an interview of Bazan on or about August 17, 1999, reflects that Bazan heard (1) Ybarra screaming and yelling, (2) her being hit, and (3) a guy saying he thought she bit him. State Habeas Transcript, Volume I, at pp. 135-36.  Nothing in those notes can reasonably be construed as establishing that Bazan ever told police or prosecutors he never *saw* Ybarra being beaten by petitioner and Cruz.  Petitioner never specifically asked prosecutor Green during her testimony at petitioner's state habeas hearing precisely what Bazan told her in August, 1999 about the nearly fatal assault upon Bazan.  Instead, petitioner attempted in his state habeas application, and has attempted in his federal habeas corpus

do not, standing alone, establish that Bazan ever said he was unable to see Ybarra being punched repeatedly by petitioner and Cruz.[80]

Insofar as petitioner complains about the prosecution's alleged failure to disclose the contents of Exhibit S to petitioner's state habeas corpus application, i.e., handwritten notes made by prosecutor Green during an August, 1999 interview with Bazan, any alleged failure to disclose those notes was not material to the outcome of either phase of petitioner's capital murder trial. The notes themselves were inadmissible hearsay. Furthermore, petitioner failed to present the state habeas court with any evidence establishing Bazan had ever seen the notes in question, much less that Bazan had ever adopted, endorsed, or otherwise represented that the contents of those notes accurately reflected his statements to prosecutor Green on the date of their interview. Prosecutor Green never testified that her notes were intended as a verbatim transcription of Bazan's words during his interview. Thus, the notes in question did not represent a statement or declaration attributable to Bazan, as opposed to their creator, prosecutor Green. The notes were nothing more than a reflection of prosecutor Green's thoughts as she interviewed Bazan.

---

petition herein, to construe Green's cryptic handwritten notes as suggesting Bazan told Green that he (Bazan) only heard Ybarra being beaten and strangled. The problem with this contention is petitioner never asked either Green or Bazan to testify under oath as to exactly what Bazan told Green during his August, 1999 interview. Bazan was fighting for his life against both Cruz and Lujan, who very nearly killed Bazan. Even assuming Bazan heard some of the noises coming from petitioner's fatal assault on Ybarra, that does not mean Bazan denied seeing any of the things he testified at trial he saw petitioner doing to Ybarra, i.e., attempting to choke Ybarra and repeatedly beating Ybarra. Nor did petitioner make any effort to his state habeas hearing to explore the apparent inconsistency between Bazan's trial testimony in which he testified he saw petitioner at one point "attempt to choke" Ybarra but could not identify exactly who "strangled" Ybarra.

[80] Bazan testified without contradiction at trial that he saw petitioner strike Ybarra. S.F. Trial, Volume 18, testimony of Moses Bazan, at pp. 125-26, 130. Bazan also testified he saw Cruz strike Ybarra. *Id.*, at p. 130.

Accordingly, the notes in question could not have been admitted at trial. Nor could they have been employed to impeach Bazan's trial testimony.

There is no reasonable probability that additional efforts to impeach Bazan in the manner suggested by petitioner in his second claims herein would have resulted in a different outcome to either phase of petitioner's capital murder trial. Petitioner was convicted of capital murder because (1) Bazan's testimony identifying petitioner as the member of the assault team who took the lead in the fatal assault upon Ybarra was corroborated in all material respects by the testimony of petitioner's accomplice-witness Cruz and (2) the physical evidence at the crime scene and Ybarra's autopsy corroborated Bazan's and Cruz's accounts of the violent confrontation that occurred in motel room 15 and the manner in which petitioner murdered Ybarra. There is no reasonable probability that, but for the failure of the prosecution to turn over to petitioner's defense team any of the materials identified by petitioner in his second claim herein (i.e., Bazan's statements to police and petitioner's exhibits S, T, U, and V), the outcome of either phase of petitioner's capital murder trial would have been different. Given the hectic, confusing, circumstances of the melee which occurred in room 15 at the time of the murder, Cruz's corroboration at trial of Bazan's trial testimony recounting most details of the melee, the testimony of Amalia Garcia which corroborated portions of Cruz's trial testimony, and the corroborating evidence found at the crime scene and during Ybarra's autopsy, any additional impeachment petitioner claims he could have obtained from access to such documents would not, in reasonable probability, had any impact upon the outcome of either phase of petitioner's capital murder trial.

b.      Additional Alibi Witnesses

Petitioner also points to handwritten notes from a prosecutor which purport to record oral statements made by Edward Guerra, Maria Garcia, and someone petitioner identifies as "Melissa Rodriguez" (the latter most likely an erroneous reference to prosecution witness *Michelle* Rodriguez), all of whom petitioner claims asserted petitioner was not present at the New Laredo Motel on the night of the murder.[81]   Petitioner did not call any of these persons to testify during the evidentiary hearing held in petitioner's state habeas corpus proceeding and never elicited any testimony from these three witnesses in which they claimed petitioner was not present at the New Laredo Motel at the time of Ybarra's murder.  Instead, as was the case with petitioner's efforts to "spin" the contents of prosecutor Green's notes from her August, 1999 interview with Bazan, petitioner attempts to discern the meaning of Green's notes without ever directly having

---

[81] Petition, at p. 33.   Exhibits T, U, and V attached to petitioner's state habeas corpus application consist of interview notes created by prosecutor Green during her interviews with Edward Guerra, "Michelle," Augustina Garcia, and Paul Sanchez. State Habeas Transcript, Volume I, at pp. 138-48.  Prosecutor Green identified her notes during her testimony at petitioner's state habeas corpus hearing. S.F. State Habeas hearing, Volume I, testimony of Mary Green, at pp. 64-70. For the same reasons set forth above in connection with prosecutor Green's notes from her interview with Moses Bazan, prosecutor Green's notes from her interviews with Edward Guerra, Michelle Rodriguez, and Augustina Garcia were inadmissible hearsay and unavailable to impeach any of those witnesses.  To reiterate, petitioner presented the state habeas court with no evidence showing either Edward Guerra, Michelle Rodriguez, or Augustina Garcia ever saw prosecutor Green's notes, much that any of those individuals ever endorsed or adopted the notes in question as their own statements. Petitioner's state habeas counsel did not attempt to interrogate prosecutor Green regarding whether her notes constituted an accurate reflection of everything those witnesses told her, as opposed to reflecting prosecutor Green's own subjective interpretation of what the witnesses told her.  None of the witness whom she interviewed testified the notes in question were accurate reflections of the words spoken by any of the witnesses.  Thus, those notes reflected prosecutor Green's subjective thoughts, not the words of the witnesses whom she interviewed.

questioned Green or those hearsay declarants regarding precisely what those potential witnesses actually told Green in August, 1999.[82]

Petitioner argues that "Melissa Rodriguez" told police petitioner left the motel sometime between 5 and 9 p.m. the evening before the murder.[83]  Petitioner argues the prosecution withheld this information from his defense team.   The problem with this argument, which appears to be premised solely upon petitioner's construction of the cryptic handwritten notes in question, is those same notes state that "Michelle" informed whoever wrote the notes she went to sleep around 10-11 p.m.[84]  Since, by all accounts, the murder of Ybarra and assault upon Bazan took place several hours later, nothing in the notes ascribed to "Michelle" offers a true alibi for petitioner.  Michelle Rodriguez testified at trial that (1) she was present at the New Laredo Motel in room 20 with petitioner and many others the evening before the murder, (2) she went to sleep sometime between 11:30 and 11:45 p.m., (3) petitioner awakened her and asked for her car keys, (4) she gave petitioner her keys and went back to sleep, and (5) she did not see her car again until the afternoon of the murder when she observed it at George and Angie's house.[85]  There is no reasonable probability that impeachment of Michelle Rodriguez by showing she went to sleep

---

[82] The three exhibits appear at State Habeas Transcript, Volume I, at pp. 138-48, as petitioner's state habeas exhibits T, U, and V.  Petitioner did not interrogate prosecutor Green concerning the meaning of all of those notes.  Instead, petitioner simply asked Green to verify a few phrases petitioner's state habeas counsel identified from each of those sets of notes.  Petitioner did not call Michelle Rodriguez, Edward Guerra, or Maria Augustina Garcia to testify during petitioner's state habeas hearing regarding what they might have told Green during their August, 1999 interviews.

[83] Petition, at p. 33.

[84] State Habeas Transcript, Volume I, at p. 144.

[85] S.F. Trial, Volume 18, testimony of Michelle Rodriguez, at pp. 225-32.

slightly earlier on the evening before the murder than she testified at trial would have had any impact upon the outcome of either phase of petitioner's capital murder trial.

Neither Edward Guerra nor Maria Garcia testified at petitioner's trial.  Petitioner did not furnish the state habeas court with any affidavits of written statements from either of these individuals purporting to establish either (1) they were available and willing to testify at the time of petitioner's trial or (2) they possessed personal knowledge of any admissible evidence relevant to any issue in petitioner's capital murder trial.  Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005).

Amalia Garcia and Michelle Rodriguez testified without contradiction at petitioner's capital murder trial that they saw petitioner, Lujan, and Cruz in room 20 at the New Laredo Motel the evening before Ybarra's murder.  Bazan and Cruz both testified at trial and identified petitioner as (1) one of the assailants who stormed room 15 during the early morning hours of March 19, 1988 and (2) the assailant who took the lead in fatally assaulting Ybarra.  Petitioner's jury implicitly rejected the purported alibi testimony offered by defense witness Mercedes Villarreal. Petitioner's presence at the New Laredo Motel in the hours immediately prior to Ybarra's murder was never seriously in dispute.  There is no evidence currently before this Court showing that Edward Guerra or Maria Garcia were available or willing to testify at petitioner's capital murder trial as to any matter relevant to any genuine issue of material fact therein.  There is no evidence before this Court, and was no evidence before petitioner's state habeas court,

showing Edward Guerra or Maria Augustina Garcia were prepared to offer any testimony at the time of petitioner's trial that would, in all reasonable probability, have resulted in a different verdict.

E.     Conclusions

Petitioner's *Brady* claims fail to satisfy either the "suppression" or "materiality" prongs of *Brady* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Brady* claims in the course of petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during petitioner's state habeas corpus proceeding. Petitioner's second claim herein does not warrant federal habeas corpus relief.

V. <em>Giglio/Napue</em> Claim

A.     The Claim

In his third claim herein, petitioner argues prosecution witness Cruz testified falsely he was not a member of the Mexican Mafia despite the fact BCADC jail records showed Cruz was "confirmed" as a member of the Mexican Mafia and the prosecution thereby violated the holding in *Napue v. Illinois*, 360 U.S. 264, 269 (1959)(holding a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment and the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears).

B.     State Court Disposition

At petitioner's trial, prosecution witness Johnny Joe Cruz testified in pertinent part that (1) he was not a member of the Mexican Mafia, (2) he did, however begin associating with members of the Mexican Mafia (including Lujan and petitioner) in early, 1998, (3) petitioner and Lujan told him Ybarra "had to go down" because she refused to pay ten percent sales tax on illicit drugs collected by the Mexican Mafia, (4) the order to kill and rob Ybarra came from Mexican Mafia officer Rene "Flaco" Munoz, (5) he assisted Lujan and petitioner in the break-in of Ybarra's motel room, the assaults upon Ybarra and Bazan, and the ransacking of Ybarra's motel room to collect the money Ybarra owed the Mexican Mafia, and (6) when questioned by police following his arrest, he gave false information about Ybarra's murder.[86]  Cruz also testified he was arrested on the same date as Ybarra's murder.[87]

At trial, however, the prosecution presented testimony (1) at the guilt-innocence phase of trial establishing that Cruz was actually arrested the day after Ybarra's murder, i.e., on March 20, 1998[88] and (2) at the punishment phase of trial establishing the Texas Department of Criminal Justice considered Cruz a "suspected" but not a "confirmed" member of the Mexican Mafia.[89]

Petitioner argued in his third ground for relief in his state habeas corpus application that the prosecution knowingly permitted Cruz to testify falsely during the guilt-innocence phase of trial by permitting Cruz to deny being a "member" of the Mexican Mafia.[90]  The state habeas trial

---

[86] S.F. Trial, Volume 18, testimony of Johnny Joe Cruz, at pp. 25, 27, 32-39, 44-53, 55-56, 71-82, 92-96.

[87] *Id.*, at p. 90.

[88] S.F. Trial, Volume 19, testimony of Andrew Carian, at p. 144.

[89] S.F. Trial, Volume 23, testimony of Clemente A. Rodriguez, at p. 7.

[90] State Habeas Transcript, Volume I, at pp. 34-35.

court found, and the Texas Court of Criminal Appeals adopted findings, that (1) petitioner failed to call any witnesses during the state habeas hearing who testified from personal knowledge that Cruz was a member of the Mexican Mafia, (2) petitioner failed to present the state habeas court with any prison or jail records or documents establishing Cruz's membership in the Mexican Mafia, and (3) petitioner's trial counsel testified he was aware Bexar County Adult Detention Center personnel considered Cruz a Mexican Mafia member and had placed Cruz in administrative segregation and he considered Cruz a member of the Mexican Mafia.[91]  The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that (1) there was no reasonable likelihood Cruz's allegedly false testimony concerning his Mexican Mafia membership affected the outcome of petitioner's trial, (2) while Cruz denied "membership" in the Mexican Mafia, he admitted he had associated with Mexican Mafia members and participated with them in following orders to commit a murder for the purpose of furthering the goals of the Mexican Mafia, and (3) by denying gang "membership" Cruz simply afforded petitioner's trial counsel another means to impeach Cruz's testimony, something they had done extensively by forcing Cruz to admit during cross-examination that he had given false information to police immediately following his arrest and for months thereafter.[92]  The Texas Court of Criminal Appeals denied petitioner's complaint about Cruz's allegedly false testimony on the merits. *Ex parte Manuel Vasquez*, 2009 WL 3842857, *1.

C.     Clearly Established Federal Law

---

[91] State Habeas Transcript, Volume II, at p. 13.

[92] State Habeas Transcript, Volume II, at pp. 14-15.

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959).  To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54; *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

D.     AEDPA Review

1.     No Proof of Actual Falsity

The fundamental problem with petitioner's complaint about Cruz's allegedly false testimony (denying his "membership" in the Mexican Mafia), as the state habeas court pointed out, is that petitioner has never presented any court with any testimony from any person possessing personal knowledge establishing that, as of the date of petitioner's trial, Cruz was, in fact, a "member" of the Mexican Mafia.  Contrary to the suggestions underlying petitioner's third claim herein, the fact that state prison officials or Bexar County jail officials may have considered Cruz to be a "member" of the Mexican Mafia does not, standing alone, make it so.

This is because, as the Fifth Circuit has pointed out, the question of "membership" in the Mexican Mafia is not definitively resolved by a showing that an individual has affiliated or associated with Mexican Mafia members or even that an individual has acted in concert with Mexican Mafia members:

55

Membership in the TMM was originally limited to convicts while they were in prison.  As the organization evolved, the TMM began to allow non-convicts to become members, but only sparingly.

The TMM constitution designates that all TMM members "are responsible for recruiting soldiers and each member which recommends a soldier will be responsible for his recommendation even though the recommendation results as an honorable one or one who deceives."  Under this system, a prospective member-referred to as a "prospecto"-must be recommended for membership by a current member, who is designated as a sponsor or "padrino" (Spanish for "godfather").  If the prospecto fouls up after he is initiated, his sponsor is responsible for resolving the matter, killing the prospecto if necessary.  In recommending a prospecto, the sponsor must submit the prospecto's name to the entire membership to acquire as much background information on the prospecto as possible.  If the prospecto is found to be acceptable, he begins a six-month probation period, at the end of which he will be accepted as a member, barring any setbacks.

TMM members refer to each other as "carnal" (Spanish for "brother") or "merecido" (Spanish slang for "a true, hard-core Mafia guy"), and commonly use tattoos for identification.  At first, the tattoos were mandatory for TMM members, but they are no longer required, because they hindered the TMM's ability to infiltrate rival gangs and made its members easy targets for law enforcement.  Nonetheless, they are still commonly displayed.

There are several tattoos that are common among TMM members.  One of these tattoos is the sequence of the arabic numerals "5, 13, 5" or the Roman numerals "V, XIII, V." The "5" or the "V" represent the fifth letter in the alphabet, "E."  The "13" or the "XIII" represent the thirteenth letter in the alphabet, "M." This sequence therefore spells "Eme," the abbreviation for Mexikanemi.  Another tattoo is shaped like a spider, with two "E"'s forming the legs of the spider and one "M" forming the body.  Other popular tattoos comprise the Aztec symbol of an eagle clutching a snake and the word "Mexikanemi" spelled out.

*United States v. Valles*, 484 F.3d 745, 748-49 (5th Cir.), *cert. denied sub nom. Garcia-Esparza v. United States*, 551 U.S. 1155 (2007).

Petitioner did not present the state habeas court with any evidence establishing that, *at the time of petitioner's trial*, either (1) any person who had identified himself on TDCJ documents or any other authenticated document as a Mexican Mafia member had also identified Cruz as a "member" of the Mexican Mafia, (2) Cruz had identified himself in any TDCJ document or other authenticated document as a Mexican Mafia "member," or (3) Cruz bore any identifiable

56

Mexican Mafia tattoos on his body.  Given Cruz's uncontradicted trial testimony that he began associating with Mexican Mafia members in early 1998, and the TMM's constitutional requirement that a "prospecto" serve a six-month probationary period, it is uncertain whether Cruz was a full Mexican Mafia "member" by the time of Ybarra's murder in March, 1998. Petitioner failed to present the state habeas court, and fails to present this Court, with any evidence showing Cruz successfully completed any probationary period or was otherwise accepted into full membership in the Mexican Mafia between the date of Ybarra's murder (March 19, 1998) and the date Cruz testified at petitioner's capital murder trial in November, 1999.  Thus, petitioner failed to present the state habeas court with any evidence establishing the factual inaccuracy of Cruz's trial testimony denying he was a "member" of the Mexican Mafia.

2.     No Showing of Materiality

"The mere *possibility* that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10 (1976)*(Emphasis added)*; *see also Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998)(applying the *Agurs* standard to the materiality prong of *Giglio-Napue* analysis), *cert. denied*, 526 U.S. 1148 (1999).

As the state habeas court correctly noted, Cruz candidly admitted (1) he had associated with persons he knew to be Mexican Mafia members (i.e., Lujan and petitioner) for some time prior to Ybarra's murder, (2) he actively participated with persons he knew to be Mexican Mafia members in planning and carrying out Ybarra's robbery and murder, (3) he knew Ybarra's murder and robbery had been ordered by Mexican Mafia officials as part of that organization's ongoing efforts to collect its illegal sales tax on the sale of illicit narcotics in San Antonio, and

57

(4) he split the proceeds of that robbery with others he knew to be Mexican Mafia members.[93] Thus, petitioner's jury was well aware that, despite Cruz's repeated denials of "membership" in the Mexican Mafia,[94] Cruz had associated, and acted in concert, with persons Cruz knew to be Mexican Mafia members for the purpose of pursuing the goals of the Mexican Mafia.

Furthermore, petitioner's trial counsel effectively cross-examined Cruz on a wide range of subjects, obtaining admissions and concessions from Cruz that (1) Cruz had given police a blatantly false statement immediately after his arrest that was intended to reduce Cruz's personal culpability for Ybarra's murder, (2) Cruz's plea agreement with prosecutors allowed him to avoid prosecution for capital murder and mandated only a very short prison term, and (3) his latest statement to police failed to mention his efforts to rob Ybarra.[95]

The primary analytical problem with petitioner's complaints about Cruz's allegedly false denials of Mexican Mafia "membership" is that, when viewed in the light most favorable to the jury's verdict, the evidence at trial established beyond any reasonable doubt that (1) Ybarra's murder was ordered by, and carried out as, part of a Mexican Mafia operation, (2) Cruz acted in concert with known Mexican Mafia members to murder and rob Ybarra, and (3) Cruz fled the scene, and later split the proceeds of their robbery of Ybarra, with known Mexican Mafia members.  Furthermore, the trial testimony of Moses Bazan and the physical evidence at the crime scene and the evidence from Ybarra's autopsy strongly corroborated Cruz's account of the

---

[93] S.F. Trial, Volume 18, testimony of Johnny Joe Cruz, at pp.  25, 27, 32-42, 44-53, 55-57, 65, 92-94.

[94] *Id.*, at pp. 25, 35, 79.

[95] *Id.*, at pp. 67-91.

critical events inside room 15 at the New Laredo Motel during the melee in the early morning hours of March 19, 1998 that resulted in Ybarra's death and Bazan's serious injuries.

Thus, whether Cruz was a formal "member" of the Mexican Mafia at the time of petitioner's trial was irrelevant to any genuine issue of material fact properly before petitioner's jury at the guilt-innocence phase of trial. Cruz admitted to doing exactly what any reasonable person would expect a member of the Mexican Mafia to do, i.e., follow the orders of higher level officials in that organization and commit criminal acts of violence. Under such circumstances, even if definitive proof of Cruz's Mexican Mafia "membership" could have been produced at the time of petitioner's trial to further impeach Cruz, there is no reasonable likelihood such evidence would have had any impact on the outcome of either phase of petitioner's capital murder trial.

E.     Conclusions

Petitioner failed to present the state habeas court with any evidence showing Cruz's denials of "membership" in the Mexican Mafia were factually inaccurate. In light of Cruz's many admissions that he acted in concert with persons he knew to be Mexican Mafia members, and the considerable evidence (including Bazan's trial testimony and the physical evidence from the crime scene and Ybarra's autopsy) corroborating the relevant portions of Cruz's trial testimony, Cruz's "membership" in the Mexican Mafia at the time of petitioner's trial was not material to any issue before petitioner's jury. The Texas Court of Criminal Appeals' determination that petitioner failed to satisfy the "materiality" prong of *Giglio-Napue* analysis was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an

59

unreasonable determination of the facts in light of the evidence presented during petitioner's state habeas corpus proceeding.

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Giglio-Napue* claim in the course of petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.  Petitioner's third claim herein does not warrant federal habeas corpus relief.

## VI. Ineffective Assistance Claims

### A.    Overview of the Claims

In his fourth claim herein, petitioner asserts a number of complaints of ineffective assistance by his trial counsel, including complaints that said counsel failed to (1) adequately investigate, develop, and present exculpatory and impeachment evidence (including failing to call a long list of identified witnesses), (2) call an expert witness to challenge the prosecution's DNA evidence, (3) voir dire the entire jury venire regarding the accomplice-witness rule and plea bargains executed by cooperating witnesses, (4) request a limiting jury instruction regarding evidence of petitioner's membership in the Mexican Mafia, (5) object to, or otherwise seek to exclude, evidence showing petitioner participated in a drug party with underage individuals in the hours immediately before Ybarra's murder, and (6) object to the prosecution's closing argument at the punishment phase of trial wherein the prosecution (a) described Texas' method of lethal

injection as a peaceful way to die and (b) characterized petitioner as "perhaps the most dangerous man to ever set foot in this building."[96]

B.      Overview of State Court Disposition

Petitioner presented essentially the same complaints to his state habeas court as his fourth claim for relief in his state habeas corpus application.[97]  The Texas Court of Criminal Appeals rejected each of petitioner's ineffective assistance claims on the merits, after reviewing and rejecting many of the state habeas trial court's findings of fact and conclusions of law regarding those claims.[98] *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

C.      Clearly Established Federal Law

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, ___ U.S. ___, ___, 130 S.Ct 383, 384 (2009); *Bobby v. Van Hook*, ___ U.S. ___, ___, 130 S.Ct. 13, 16 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, ___ U.S. ___, ___, 130 S.Ct. 447, 452-53 (2009); *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386).

---

[96] *Petition*, at pp. 35-61.

[97] State Habeas Transcript, Volume I, at pp. 35-61.

[98] State Habeas Transcript, Volume II, at pp. 18-39.

61

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, ___ U.S. at

___, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688-89.  It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534.  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 390-91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004).  In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*  As the Supreme Court has recently explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S.Ct. 26, __, 181 L.Ed.2d 328, 2011 WL 5299458, *1 (Nov. 7, 2011)(quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011)).

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo. See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005)(holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 365 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2383 (2009); *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698; *Strickland v. Washington*, 466 U.S. at 690; *Scheanette v. Quarterman*, 482 F.3d 815, 820 (5th Cir. 2007), *stay*

*denied*, 555 U.S. 1160 (2009); *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, 552 U.S. 948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

The state habeas trial court addressed both prongs of the *Strickland* analysis in its findings of fact and conclusions of law.  However, the Texas Court of Criminal Appeals rejected significant portions of the state habeas court's analysis of petitioner's ineffective assistance claims, leaving no factual findings or conclusions with regard to one of the prongs of the *Strickland* analysis on some of petitioner's ineffective assistance claims.  When a state court has not addressed the merits of a particular prong of *Strickland* vis-a-vis a particular ineffective assistance claim, this Court's review of that prong of *Strickland* is necessarily *de novo*. *See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).  While the AEDPA greatly restricts the scope of this Court's review of petitioner's ineffective assistance claims, out of an abundance of caution, this Court will independently examine and make de novo determinations as to whether any of petitioner's ineffective assistance claims satisfy either prong of *Strickland*.

D.      Failure to Investigate, Develop, and Present Exculpatory and Impeachment Evidence

1.      The Complaints

Petitioner's first set of complaints about the performance of his trial counsel consists of arguments that said counsel failed to adequately investigate the case against petitioner, failed to interview numerous witnesses (some identified but many not), and failed to present these witnesses' testimony at trial.[99]  More specifically, petitioner argues his trial counsel should have interviewed and called to testify at trial (1) the occupants of rooms 16 and 21 at the New Laredo Motel on the night of the murder, including Elvira Perez, (2) BCADC inmate Guadalupe Esparza, (3) Ray Hernandez, (4) petitioner's acquaintances Angie Chavarria, George Martinez, Edward Guerra, Melissa Rodriguez, Maria Augustine Garcia, Jerry Chavarria, Juan Vargas, Brenda Monreal, and Ernest Aguillon, Sr., and (5) petitioner's alleged accomplice in a series of burglaries and robberies, Jeff Lang.

2.      State Court Disposition

Petitioner called only four of the many "new" witnesses identified by petitioner in his state habeas corpus application and the exhibits thereto to testify during petitioner's state habeas corpus hearing (i.e., Guadalupe Esparza, Jerry Chavarria, Jr., George Martinez, and Ernest Aguillon).  Petitioner presented the state habeas trial court with affidavits from only three other members of this group of potential witnesses (i.e., Angie Chavarria, Juan Vargas, and Jeffrey Lang).

Guadalupe Esparza was convicted in March, 2001 for the June, 1999 capital murder of seven-year-old Alyssa Vasquez and sentenced to death.  Esparza has since been executed for that offense.  At the time of petitioner's capital murder trial in November, 1999, Esparza was

---

[99] *Petition*, at pp. 35-40, 51-54.

66

awaiting trial on his own capital murder charge.  At the evidentiary hearing held August 5, 2005 in petitioner's state habeas corpus proceeding, Guadalupe Esparza testified (1) he had received numerous death threats from the Mexican Mafia and had been placed in administrative segregation for his own protection, (2) he met petitioner in jail in November, 2000, (3) he also met Lujan in the jail, (4) Lujan told him that Lujan and Cruz were partners, (5) Lujan told him that Cruz was going to lie to implicate petitioner in Ybarra's murder, (6) Lujan told him petitioner had nothing to do with Ybarra's murder and petitioner was not present at the motel when Ybarra was murdered, (7) Lujan told him Cruz actually committed Ybarra's murder, and (8) Cruz later admitted to him that Cruz killed Ybarra.[100]

Jerry Chavarria, Jr. testified during petitioner's state habeas hearing that (1) he had multiple felony convictions, including convictions for burglary and drug offenses, (2) between 5:30 and 8 a.m. on March 19, 1998 he did not see petitioner at George Martinez's home, where he (Chavarria) was staying while wearing an ankle monitor, and (3) around six a.m., he saw Lujan and Cruz come over the George Martinez's home, where they changed clothes.[101]

George Martinez testified during the same hearing that (1) he awoke sometime between eight and nine a.m. on March 19, 1998 and saw Lujan and Cruz arrive at his home, (2) petitioner was not with them, (3) petitioner was not present at his home on the morning of March 19, 1998 when Lujan and Cruz arrived, (4) petitioner did arrive later and introduced Martinez to petitioner's girlfriend, Mercedes Villarreal, (5) he used heroin the night before, (6) he could not

---

[100] S.F. State Habeas Hearing, Volume I, testimony of Guadalupe Esparza, at pp. 12-29.

[101] S.F. State Habeas Hearing, Volume I, testimony of Jerry Chavarria, Jr., at pp. 31-43.

say exactly what time he got up on March 19, 1998, and (7) he had been convicted of a drug trafficking offense and was awaiting trial on an assault charge.[102]

Ernest Aguillon testified at the same hearing that (1) on the evening of May 19, 1998, he went to the Mayfield Motel with Brenda Monreal, (2) the Mayfield Motel was close to the New Laredo Motel, (3) he met petitioner at the Mayfield Motel late, between 10:00 p.m. and midnight, (4) he had multiple burglary convictions and convictions for drug and theft offenses, and (5) he might have seen petitioner at the New Laredo Motel instead of the Mayfield Motel.[103]  Petitioner also introduced Aguillon's affidavit, which had been attached as Exhibit N to petitioner's state habeas corpus application.[104]

Petitioner also submitted affidavits from Juan Vargas and Jeffrey Lang into evidence during that hearing.[105]  In his affidavit, Vargas stated (1) he saw petitioner and petitioner's girlfriend at the home of George Martinez and Angie Chavarria at an unspecified time on March 19, 1998, (2) he and petitioner went to the home of Joe Fernandez to purchase a Cadillac which they then drove to George Martinez's home, (3) he then went to the Mayfield motel with petitioner, Michelle, and her baby, and (4) petitioner rented a room at the Mayfield Motel sometime between 10:00 and 11:00 p.m. on March 19, 1998.[106]

_____

[102] S.F. State Habeas Hearing, Volume I, testimony of George Martinez, at pp. 44-51.

[103] S.F. State Habeas Hearing, Volume I, testimony of Ernest Aguillon, at pp. 53-61.

[104] State Habeas Transcript, Volume I, at p. 112.

[105] S.F. State Habeas Hearing, Volume I, at pp. 61-62.

[106] Affidavit of Juan R. Vargas, dated August 10, 2000, Exhibit M to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 110.  Vargas' affidavit does not purport to identify the specific time he first saw petitioner and Mercedes Villarreal at the home of George

In his affidavit, Jeffrey Lang states (1) he does not believe prosecution witness Jeanette Fernandez is a truthful person, (2) it was his understanding Fernandez testified petitioner hit her and Lang witnessed same, (3) he had never witnessed petitioner strike a woman, (4) he had never seen petitioner strike or hit Fernandez, and (5) Fernandez had never told him that petitioner had struck her.[107]

Petitioner's first chair trial counsel, attorney Joel Perez, testified during the petitioner's state habeas corpus hearing that (1) the defense team had a court-appointed investigator so he (Perez) did not personally interview any of the fact witnesses, (2) the affidavits of George Martinez and Angie Chavarria contradicted the alibi testimony at trial of defense witness Mercedes Villarreal, (3) Villarreal was a better witness than Martinez and Chavarria because Villarreal was not a drug user, Villarreal had reasons why she did not want to testify (possible harm to her marriage from revelation of her affair with petitioner), and there was evidence before the jury suggesting Martinez and Chavarria might have conspired with petitioner to conceal bloody clothing worn by the assailants who attacked Ybarra and Bazan, (4) the defense team had trouble finding the people who had been staying at the New Laredo Motel the night of the murder, (5) petitioner confirmed Villarreal's account of the events on the morning of March 19, 1998, and (6) he could not testify as to what his co-counsel, attorney Rush, or the defense team's investigator may have discovered during their pretrial investigation.[108]

---

Martinez and Angie Chavarria; nor does it offer petitioner any alibi for the murder of Ybarra.

[107] Affidavit of Jeffrey Lang, dated October 12, 2000, Exhibit Y to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 155.

[108] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at pp. 85-88, 91, 100-01, 103-05, 111.

The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that (1) with regard to those witnesses from whom petitioner failed to elicit any testimony of affidavits, petitioner's ineffective assistance claims failed, (2) given the conflicting testimony and criminal records of the persons whom petitioner argued should have been interviewed, those witnesses were not credible, (3) the new alibi witnesses proffered by petitioner would have contradicted and undermined the alibi testimony of Mercedes Villarreal, petitioner's only viable defense at the guilt-innocence phase of trial, (4) Lang's proffered testimony would not have impacted the outcome of the punishment phase of petitioner's capital murder trial, and (5) with the exception of Jerry Chavarria, petitioner failed to present any evidence showing any of his new witnesses were available to testify at petitioner's capital murder trial.[109]  The Texas Court of Criminal Appeals rejected this aspect of petitioner's multi-faceted ineffective assistance claim on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

3.      AEDPA Review

a.      No Deficient Performance

The evaluation of defense counsel's performance under the first prong of *Strickland* is an objective one focusing on the reasonableness of said counsel's conduct in view of the information in the possession of defense counsel and the information which, through the exercise of due diligence, defense counsel could and should have had at their disposal. *Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms

---

[109] State Habeas Transcript, Volume II, at pp. 23-25.

which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

Petitioner called only one member of his defense team to testify during the evidentiary hearing held in petitioner's state habeas corpus proceeding.  Attorney Joel Perez candidly admitted he did not personally interview any of the witnesses listed by petitioner in his state habeas corpus application but emphasized (1) the fact petitioner's defense team had a court-appointed investigator, (2) his co-counsel, attorney Rush, may have spoken with those witnesses, (3) petitioner's state habeas counsel had possession of notes indicating petitioner's former defense counsel Snyder may have interviewed some of the witnesses in question, (4) the defense team had difficulty locating the individuals who stayed at the New Laredo Motel on the night of the murder, (5) the prosecution had an open file policy and he did review the prosecution's file, (6) petitioner's account of the morning of the murder was consistent with Mercedes Villarreal's trial testimony, (7) the "new" witnesses identified by petitioner asserted facts which conflicted with Mercedes Villarreal's alibi testimony, and (8) he could not testify regarding the investigative actions of the defense team's investigators or his co-counsel.[110]  Given the fact he joined petitioner's defense only days before the start of voir dire, it is hardly surprising attorney Perez did not personally interview any of the witnesses listed in petitioner's state and federal habeas corpus pleadings.  Petitioner failed to call either of the two court-appointed investigators who assisted his defense team at various times, petitioner's co-counsel at trial (i.e., attorney Wendellyn Rush), or the attorney who served as petitioner's first chair defense counsel for more

---

[110] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at pp. 85-88, 100-01, 103-05, 111.

than a year (attorney Jacqueline Snyder).  Thus, petitioner failed to establish through the

testimony of petitioner's defense team precisely (1) what pretrial investigation petitioner's

defense team undertook or (2) what information his defense team obtained from the individuals

whom they did interview.

While petitioner did call four other witnesses to testify during his state habeas hearing

(i.e., Guadalupe Esparza, Jerry Chavarria, Jr., Ernest Aguillon, and George Martinez), petitioner

failed to ask any of those four persons whether they ever communicated with petitioner's defense

team prior to petitioner's trial.  It is, therefore, unknown whether petitioner's defense team spoke

with any of these persons prior to trial.  As the state habeas court correctly pointed out, of these

four persons, only Jerry Chavarria, Jr. testified he would have been available to testify at

petitioner's capital murder trial had he been called to do so.[111]

Petitioner also presented the state habeas court with affidavits from Angie Chavarria,[112]

George Martinez,[113] Guadalupe Esparza,[114] Jerry Chavarria, Jr.,[115] Juan Vargas,[116] Ernest

---

[111] S.F. State Habeas Hearing, Volume I, testimony of Jerry Chavarria, Jr., at p. 37.

[112] Affidavit of Angie Chavarria, attached as Exhibit H to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 99.

[113] Affidavit of George Martinez, attached as Exhibit I to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 101.

[114] Declaration of Guadalupe Esparza, attached as Exhibit K to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 106.

[115] Affidavit of Jerry Chavarria, Jr., attached as Exhibit L to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 108.

[116] Affidavit of Juan R. Vargas, attached as Exhibit M to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 110.

Aguillon, Sr.,[117] and Jeffrey Lang.[118]  None of these affidavits, however, state whether any of these individuals ever spoke with petitioner's defense team prior to trial.  It is, therefore, unknown whether petitioner's defense team ever spoke with any of these persons prior to trial.  Likewise, none of these affidavits purport to establish that any of these witnesses were available and would have been willing to testify at petitioner's capital murder trial.

Petitioner also identifies in his pleadings herein two other potential witnesses, i.e., Elvira Perez and Ray Hernandez.  However, petitioner failed to call either of these persons to testify during his state habeas corpus proceeding and failed to present the state habeas court with any affidavits or declarations from these persons.  Thus, there was no evidence before the state habeas court establishing (1) whether these persons spoke with petitioner's defense team prior to trial, (2) they were available to testify at petitioner's trial, or (3) the contents of any relevant testimony they could have furnished at the time of petitioner's trial.

The fundamental problem with petitioner's complaints about his trial counsel's alleged failure to adequately investigate the case against petitioner and to interview and call potentially favorable witnesses to testify at trial is that petitioner presented the state habeas court with no evidence showing either (1) the identities of the persons whom petitioner's defense team actually did interview prior to trial or (2) the content of the information those persons gave to petitioner's defense team.  Petitioner did not present the state habeas court with any evidence showing who

---

[117] Affidavit of Ernest Aguillon, Sr., attached as Exhibit N to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 112.

[118] Affidavit of Jeffrey Lang, attached as Exhibit Y to petitioner's state habeas corpus application, State Habeas Transcript, Volume I, at p. 155.

his defense team interviewed or what information his defense team obtained from those persons. For all the state habeas court knew, petitioner's trial counsel and court-appointed investigators may, in fact, have actually interviewed each of the "new" witnesses listed in petitioner's state habeas corpus application, reasonably determined those witnesses possessed no personal knowledge of any helpful evidence, and reasonably concluded not to call those witnesses to testify at trial. Simply put, petitioner failed to present the state habeas court with any evidence establishing the extent of his defense team's pretrial investigation was itself objectively unreasonable. Without such a showing, it is impossible to fault the performance of petitioner's defense team regarding their investigation of the case against petitioner. Petitioner failed to carry his burden of showing the extent of his defense team's pretrial investigation into the case against petitioner was objectively unreasonable. *Cf. Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002)(recognizing that, in evaluating the performance of trial counsel against a claim that said counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied*, 537 U.S. 1104 (2003).

Furthermore, insofar as petitioner complains about his trial counsels' failure to call Angie Chavarria and George Martinez to testify at trial, given their affidavits before the state habeas court (wherein both these potential witness claimed they saw petitioner and Mercedes Villarreal at their home on the morning of March 19, 1998) refuted the alibi trial testimony of Mercedes Villarreal, the decision by petitioner's trial counsel to rely upon Villarreal's alibi testimony (wherein she testified she picked up petitioner on the morning of March 19, 1998, took him to

her home, and he remained there until afternoon) was objectively reasonable.  Unlike George

Martinez and Angie Chavarria, who had been implicated in the coverup of Ybarra's murder by

prosecution witnesses (who testified bloody clothing and bloody towels from the motel were

observed at George Martinez's and Angie Chavarria's home the morning of the murder).[119]

George Martinez admitted during his testimony at petitioner's state habeas hearing that he had a

criminal record and he (and many others present at his home) had been using drugs the evening

before the murder.[120]  Under such circumstances, it was objectively reasonable for petitioner's

trial counsel to have chosen to rely upon an alibi furnished by Mercedes Villarreal, rather than a

purported alibi from Angie Chavarria and George Martinez, the latter of which placed petitioner

within a few blocks of the crime scene on the morning of Ybarra's murder.

      b.    No Prejudice

To satisfy the second or "prejudice" prong, a convicted defendant must establish a

reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the

result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland*

*v. Washington*, 466 U.S. at 694.

Complaints of uncalled witnesses are not favored, because the presentation of testimonial

evidence is a matter of trial strategy and because allegations of what a witness would have

---

[119] Cruz testified he, petitioner, and Lujan drove to George Martinez's house immediately after the murder, changed clothes there, and left their bloody clothing there. S.F. Trial, Volume 18, testimony of Johnny Joe Cruz, at pp. 52-55.  Amalia Garcia testified she saw a pile of bloody towels from the motel and bloody rags on the floor near the kitchen doorway at George Martinez's home the morning of the murder. S.F. Trial, Volume 18, testimony of Amalia Garcia, at pp. 196, 208-10.

[120] S.F. State Habeas Hearing, Volume I, testimony of George Martinez, at pp. 48-50.

testified are largely speculative. *Day v. Quarterman*, 566 F.3d at 538; *Coble v. Quarterman*, 496 F.3d at 436; *Miller v. Dretke*, 420 F.3d at 362.  With regard to those "new" witnesses identified in petitioner's pleadings herein for whom petitioner furnished the state habeas court with neither live testimony nor an affidavit purporting to identify any admissible testimony these persons could have furnished at the time of petitioner's trial (i.e., Maria Augustina Garcia, Edward Guerra, Melissa Rodriguez, Elvira Perez, Ray Hernandez, Brenda Monreal, and the occupants of rooms 16 and 21 at the New Laredo Motel on March 19, 1998), petitioner's complaints do not satisfy the prejudice prong of *Strickland*. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994)(holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).  Because petitioner failed to present the state habeas court with any admissible evidence showing what these uncalled witness would have furnished in terms of admissible testimony, the state habeas court's conclusion that these complaints failed to satisfy the prejudice prong of *Strickland* was reasonable.

The state habeas court's conclusions that petitioner's complaints about the other uncalled witnesses failed to satisfy the prejudice prong of *Strickland* were equally reasonable.

At the time of petitioner's capital murder trial in November, 1999, Guadalupe Esparza was a convicted felon who had been charged with the capital murder of a seven-year-old girl whose naked body was found within blocks of her home bearing the tell-tale signs of sexual

assault: Esparza's semen.[121]   Esparza's victim, Alyssa Vasquez, was believed by many in the community to have been a relative of known Mexican Mafia members.  Esparza did not claim to possess any personal knowledge of any facts relevant to the case against petitioner.  Instead, Esparza stated in his declaration and testified during petitioner's state habeas hearing that (1) Lujan had informed Esparza that Cruz, not petitioner, had murdered Ybarra, (2) Lujan stated that petitioner was not present at the time and place of Ybarra's murder, (3) Lujan told him Cruz planned to lie to implicate petitioner, and (4) when Esparza confronted Cruz, Cruz admitted he had killed Ybarra.  Thus, most of Esparza's testimony would have been subject to objection as hearsay had he been called to testify at petitioner's trial.  Moreover, given the facts (1) Bazan identified petitioner as one of the assailants who broke into Ybarra's motel room and fatally assaulted her, (2) Amalia Garcia testified without contradiction that she saw Lujan, petitioner, and Cruz preparing to put bandanas and other coverings over their faces shortly before the murder, (3) Garcia also testified without contradiction she heard one of them say "Let's go get someone," and (4) Michelle Rodriguez testified without contradiction that she loaned petitioner her car keys on the night of the murder, there is no reasonable probability that, but for the failure of petitioner's defense team to call Guadalupe Esparza to testify at trial (presumably to impeach Cruz), the outcome of either phase of petitioner's capital murder trial would have been any different.

As explained above, Angie Chavarria and George Martinez had been implicated by Cruz and another prosecution witness in the cover-up of Ybarra's murder.  Martinez's and Chavarria's

---

[121] This Court takes judicial notice of the pleadings, motions, and state court records filed in this Court in Guadalupe Esparza's federal habeas corpus action challenging his capital murder conviction and sentence of death, i.e., cause no. SA-07-CA-265-FB.

affidavits purport to establish a new alibi for petitioner but one which effectively undermined the alibi trial testimony of Mercedes Villarreal.  Nothing in George Martinez's affidavit or the testimony at petitioner's state habeas hearing or in Angie Chavarria's affidavit casts any doubt upon the veracity of Moses Bazan's trial testimony identifying petitioner as one of the assailants who broke into room 15 at the New Laredo Motel during the early morning hours of March 19, 1998 and fatally assaulted Ybarra.  There is no reasonable probability either George Martinez's or Angie Chavarria's testimony would have resulted in a different outcome for either phase of petitioner's capital murder trial.

        In both his affidavit and testimony at petitioner's state habeas hearing, Jerry Chavarria, Jr. challenged Cruz's trial testimony that Cruz, Lujan, *and petitioner* changed clothing at George Martinez's and Angie Chavarria's house the morning of the murder.  However, Jerry Chavarria did corroborate Cruz's assertion that Cruz and Lujan went to the Martinez-Chavarria residence the morning of the murder.  Furthermore, Jerry Chavarria's assertion that petitioner was never at the Martinez-Chavarria residence the morning of the murder was inconsistent with the affidavits of George Martinez and Angie Chavarria, both of whom claimed to have seen petitioner and Mercedes Villarreal at their home that morning.  Finally, Jerry Chavarria's proffered testimony did not undermine the veracity of Moses Bazan's trial testimony identifying petitioner as the primary assailant who fatally assaulted Ybarra.  There is no reasonable probability the outcome of either phase of petitioner's capital murder trial would have been any different had Jerry Chavarria, Jr. testified at trial in the same manner he testified at petitioner's state habeas hearing.

        There is likewise no reasonable probability any testimony Ernest Aguillon could have furnished would have altered the outcome of either phase of petitioner's capital murder trial.  In

his affidavit, dated August 10, 2000, and testimony at petitioner's state habeas hearing, Ernest Aguillon claimed he met petitioner between 10:00 and 11:00 p.m. on March 19, 1998 at the Mayfield Motel. In view of the consensus among trial witnesses that Ybarra was murdered during the early morning hours of March 19, 1998, Aguillon's testimony regarding his meeting with petitioner many hours thereafter could not have furnished petitioner any benefit at trial. Neither Aguillon's hearing testimony nor his affidavit furnish any recognizable alibi for petitioner.

Jeffrey Lang's affidavit asserts that he has never seen petitioner assault Jeanette Fernandez or any other woman. Fernandez never testified petitioner struck her. Instead, Fernandez testified *at the punishment phase* of petitioner's capital murder trial, *without contradiction*, that (1) she, petitioner, Lang, and another person committed a series of burglaries of Pizza Hut restaurants during September/October , 1996, (2) petitioner and Lang committed two armed robberies of other businesses of which she was aware (and in one of which she participated), (3) she witnessed petitioner assault Christine Garcia in an incident that resulted in the arrest of both petitioner and Lang, (4) Lang assaulted her on one occasion, (5) petitioner refused to come to her aid while Lang was assaulting her, and (6) she was afraid of petitioner.[122] Significantly, Lang's affidavit does not purport to refute any of Fernandez's accusations about Lang's participation in any of the burglaries or armed robberies described by Fernandez. Even if Lang had been called to testify at the punishment phase of petitioner's trial, there is no reasonable probability Lang's testimony (assuming it mirrored the contents of Lang's affidavit) would have resulted in a different answer by petitioner's jury to any of the Texas capital

---

[122] S.F. Trial, Volume 23, testimony of Jeanette Fernandez, at pp. 26-43, 46.

sentencing special issues.  By that point, petitioner's jury had concluded beyond a reasonable

doubt that petitioner was guilty of capital murder in connection with the brutal assault upon

Ybarra.  There was evidence in the record showing petitioner had participated in two other

murders (one of which was described without contradiction by a prosecution witness as an

execution ordered by the Mexican Mafia) and very nearly fatally stabbed a third person.  In

addition, petitioner's cousin Fernandez testified, again without contradiction, that she had

witnessed petitioner's participation in a series of burglaries of businesses, an armed robbery, and

multiple assaults upon others, including members of their family.  There was no evidence before

petitioner's capital sentencing jury suggesting petitioner had ever expressed sincere contrition or

remorse for any of his violent criminal actions.  At the punishment phase of petitioner's trial,

petitioner's father, uncle, cousin, and sister all made emotional appeals for mercy on petitioner's

behalf.[123]  Under such circumstances, any limited impeachment value petitioner might have

hoped to derive from Lang's testimony at trial would, in all reasonable likelihood, have been

more than offset or negated by the potentially devastating cross-examination to which Lang could

have been subjected based upon his own criminal record.[124]  Even if Jeffrey Lang had some how

convinced petitioner's jury that petitioner had not assaulted Christine Garcia (as Jeanette

Fernandez testified at trial), there is not a reasonable probability that the outcome of the

punishment phase of petitioner's capital murder trial would have been different.

---

[123] S.F. Trial, Volume 23, testimony of Manuel Rodas Vasquez, at pp. 60-62, 64; testimony of Alfredo Fernandez, at pp. 69, 75; testimony of Diane Galindo, at pp. 82-83; testimony of Mary Helen Vasquez, at p. 97.

[124] It is also far from clear whether Lang would have been willing to testify at the punishment phase of petitioner's trial had Lang (and his counsel) been aware of Fernandez's trial testimony identifying Lang as a participant in multiple un-prosecuted burglaries and armed robberies.

Petitioner also complains that his trial counsel failed to elicit testimony at trial from the wife of prosecution witness Hitendra Bhakta that she spoke with the guests in room 16, who checked out around 7:45 a.m. the morning of the murder.  This aspect of petitioner's ineffective assistance complaints lacks merit.  First, on cross-examination at trial Bhakta did, in fact, testify the people in room 16 checked out at 7:45 a.m. on the date of the murder.[125]  Thus, petitioner's trial counsel did elicit the testimony in question.  Moreover, Bhakta's statement to police attached as Exhibit G to petitioner's state habeas corpus application states that it was Bhakta's spouse, who spoke only Gujarati and understood only a little English, who actually saw the people in room 16 leave at 7:45 - Bhakta denied personally seeing the people in room 16 come or go that morning.[126]  Furthermore, petitioner's lead trial counsel testified without contradiction during petitioner's state habeas hearing, that because Bhakta's wife spoke little English (and therefore could probably not have communicated with the guests in room 16), he could see no basis for using Bhakta's wife's testimony in an attempt to ascertain whether the guests in room 16 had complained about noise in room 15.[127]  Petitioner never presented the state habeas court with any testimony or affidavit from Bhakta's spouse or any other person possessing personal knowledge establishing that the motel guests who had occupied room 16 on the night of the murder either (1) were physically present in room 16 at the time of the murder, (2) heard any noises coming from room 15, or (3) ever complained to Bhakta's spouse about same.  Thus, petitioner's complaint fails to satisfy either prong of *Strickland* analysis.

---

[125] S.F. Trial, Volume 19, testimony of Hitendra Bhakta, at p. 86.

[126] State Habeas Transcript, Volume I, at p. 97.

[127] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at p. 93.

4.      Conclusions

Petitioner's complaints about his trial counsels' alleged failure to adequately investigate the case against petitioner and to develop and present additional witnesses all fail to satisfy either prong of *Strickland* analysis.   The Texas Court of Criminal Appeals' rejection on the merits of this aspect of petitioner's ineffective assistance claims in the course of petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.

E.      Failure to Challenge DNA Evidence

1.      The Complaint

Petitioner argues his trial counsel should have called their own DNA expert to challenge the analysis offered by the prosecution's DNA expert.[128]

2.      State Court Disposition

At trial, the prosecution's DNA expert, Gustavo DeLeon, testified regarding testing done on various items of bloody clothing found inside the trunk of Michelle Rodriguez's car two days after the murder.[129]   In pertinent part, DeLeon testified that (1) Bazan was a possible source of the DNA found on the shirt and jacket found among the blood-stained clothing, (2) DNA on a towel

---

[128] *Petition*, at pp. 40-42, 54-55.

[129] A San Antonio Police detective testified regarding the discovery of the items of bloody clothing in question on March 21, 1998. S.F. Trial, Volume 19, testimony of John Bocke, at pp. 63-78.

and pair of shorts were not attributable to Bazan or Ybarra, (3) Lujan was not a possible source of the DNA found on the shorts or jacket, (4) Cruz was excluded as a possible source of the DNA on the shorts and jacket, and (5) petitioner could not be eliminated as a possible source of the DNA on the shorts but was excluded as a possible source of the DNA on the jacket.[130]

During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented testimony from professor and DNA expert Paul Goldstein, who testified, in pertinent part, that (1) he had reviewed records from DeLeon's analysis, (2) he found an error in transferring data from one page to another and questioned the practice of "calling" a "peak" without a minimum RFU of at least 150, (3) he did not purport to contest DeLeon's trial testimony, (4) he had never personally analyzed any samples using forensic DNA analysis, (5) he was not qualified as a forensic DNA examiner, (6) he did not know if DeLeon used "peaks" of less than 150 to reach his conclusions, (7) he found no irregularities in the DNA work done on the shorts identified by DeLeon as containing DNA for which petitioner could not be excluded as a possible source, and (8) he did not have a problem with the actual production of the graphs produced by DeLeon, only with the manner in which those graphs were interpreted.[131]

The state then called the technical leader for the Bexar County Clinical Investigative Laboratory's Serology DNA section, who testified (1) he had reviewed DeLeon's report and the accompanying documentation, (2) proper protocols were followed, (3) he personally trained DeLeon to note all peaks, even those below the threshold for making conclusions, (4) no

---

[130] S.F. Trial, Volume 19, testimony of Gustavo DeLeon, at pp. 103-12.

[131] S.F. State Habeas Hearing, Volume II, testimony of Paul Goldstein, at pp. 4-50.

conclusions had been drawn on the first alleged error identified by Dr. Goldstein (where the finding had been the ultimate results were "inconclusive"), and (5) he reached the same conclusions as DeLeon.[132]

Attorney Joel Perez testified, in pertinent part, that (1) his co-counsel, attorney Wendy Rush, had taken the lead in conferring with the defense team's DNA expert, (2) after conferring with their DNA expert, the defense team decided not to call their own expert to testify, but, rather (3) the defense decided to employ the information their DNA expert furnished them to cross-examine DeLeon.[133]  For unknown reasons, petitioner did not call either attorney Rush or petitioner's DNA expert to testify during petitioner's state habeas corpus hearing.

The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that (1) petitioner had failed to show petitioner's DNA expert would have presented testimony at trial beneficial to the defense, (2) Dr. Goldstein's testimony established, at best, that DeLeon had improperly noted a peak that fell below an appropriate threshold, (3) the notation in question was not used to draw any ultimate conclusions in the case and did not involve the particular evidence identified as having genetic material consistent with petitioner, (4) Goldstein's testimony would not have been beneficial to the defense at trial, and (5) petitioner's complaint did not satisfy the prejudice prong of *Strickland* analysis.[134]  The Texas Court of Criminal Appeals rejected this aspect of petitioner's ineffective assistance claims on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

---

[132] S.F. State Habeas Hearing, Volume II, testimony of Garon Foster, at pp. 51-73.

[133] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at p. 84.

[134] State Habeas Transcript, Volume II, at p. 29.

3.     AEDPA Review

a.     No Deficient Performance

As explained above, the first prong of *Strickland* analysis turns on the objective reasonableness of trial counsel's conduct in light of the information known or reasonably available to said counsel. *Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

Petitioner failed during his state habeas corpus hearing to present the state habeas court with any evidence showing precisely what information petitioner's DNA expert imparted to petitioner's trial counsel. Petitioner called neither said expert nor attorney Wendy Rush, whom attorney Perez identified without contradiction as having taken the lead in terms of the DNA aspect of the case. Absent some showing as to precisely what information petitioner's defense team's attorneys had from the defense team's DNA expert, it is impossible to fault as objectively unreasonable the decision by petitioner's defense team not to call their own DNA expert to testify at trial. Simply put, without any evidence showing either (1) the exact nature of the advice or counsel furnished by petitioner's DNA expert or (2) that petitioner's trial counsel had any reason to question or doubt the efficacy of their own expert's advice, petitioner's trial counsel cannot be faulted for the strategic decision they made in reliance upon their own expert's conclusions. For all the state habeas court knew, and all this Court knows, the petitioner's DNA expert may well have informed petitioner's trial counsel that he or she could not furnish any helpful testimony if called to testify at petitioner's trial. Petitioner failed to present the state

habeas court with any evidence showing the actions of petitioner's trial counsel were, under the circumstances, objectively unreasonable. Thus, petitioner failed to carry his burden of showing that his trial counsels' decision not to call the defense team's DNA expert to testify was objectively unreasonable.

        b.      No Prejudice

The state habeas court correctly concluded that Dr. Goldstein offered no testimony during petitioner's state habeas corpus hearing which undermined the efficacy of any of prosecution witness DeLeon's conclusions via-a-vis the lone piece of forensic evidence linking petitioner to the bloody clothing found in Michelle Rodriguez's car trunk. Additionally, nothing Dr. Goldstein said during his testimony at petitioner's state habeas corpus hearing on September 30, 2005 would have had any impact upon the credibility of the trial testimony of prosecution witnesses Cruz or Bazan. In fact, the presence or absence of petitioner's DNA on a pair of shorts found in Michelle Rodriguez's car trunk on March 21, 1998 was not tangential to the most salient aspects of the prosecution's case, i.e., the facts (1) both Cruz and Bazan identified petitioner as one of the assailants who attacked Bazan and Ybarra, (2) Amalia Garcia testified without contradiction that she saw petitioner, Lujan, and Cruz shortly before Ybarra's murder a few doors down from Ybarra's motel room preparing bandanas and motel towels as coverings for their faces, and (3) Amalia Garcia later saw bloody motel towels at the home of George Martinez and Angie Chavarria (the same location Cruz testified he and the other assailants went to change clothes and clean up after Ybarra's murder). There is no reasonable probability that, but for the absence of Dr. Goldstein's testimony from petitioner's trial, the outcome of either phase of petitioner's capital murder trial would have been different.

4.      Conclusions

Petitioner's complaint about his trial counsels' failure to call the defense team's DNA expert to testify at petitioner's trial fails to satisfy either prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of petitioner's ineffective assistance claims in the course of petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.

F.      Failure to Voir Dire Venire Re Accomplice-Witness Rule

1.      The Complaint

Petitioner next faults his trial counsel failing to voir dire the entire jury venire regarding the accomplice-witness rule and petitioner's co-defendant's plea bargain.[135]

2.      State Court Disposition

On October 25, 1999, after the parties had been engaged in individual voir dire one week, prosecutor Green announced the prosecution had reached a plea agreement with Johnny Joe Cruz and would be amending its witness list accordingly.[136]  At the request of petitioner's trial counsel, the prosecution explained that Cruz's plea agreement called for Cruz, in exchange for cooperation, to enter a plea of guilty to a charge of aggravated robbery and receive a seven-year

---

[135] *Petition*, at pp. 42-43, 56.

[136] S.F. Trial, Volume 14, at p. 4.

sentence.[137]   Near the end of the same day, petitioner's trial counsel and the trial court had the

following exchanges:

> MR. PEREZ:  Your Honor, I would just like to put on the record that I'd like the opportunity to go back through this panel and inquire of this panel regarding the accomplice witness rule.  In addition, I would inquire into their perceptions and their insight regarding plea bargains by the State –- regarding plea bargains as the State has represented to the Defense right not that they agreed with the co-Defendant in this case to a seven-year punishment when the initial indictment is capital murder.

> That it –- again, it would deny –- it denies my client due process and, in effect, assistance of counsel, Your Honor, when the State waits until we have nine seated jurors to either disclose or reach an agreement with the co-Defendant, and which opens up a new can of worms, a whole ne can of worms.  And I'm basing that on the Fourth, Fifth and Sixth –- well, Fifth and Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 and 19 of the Texas Constitution.

> THE COURT:  You were aware before this voir dire process began that the State was attempting to make a deal, correct?

> MR. PEREZ:  It had been represented to me that no deals were on the table, Your Honor.

> THE COURT:  That wasn't my question.  You were aware that before voir dire began that the State was attempting to make a deal with this co-Defendant, correct?

> MR. PEREZ:  I was aware that they had attempted to, Your Honor.

> THE COURT:  And were continuing to attempt?

> MR. PEREZ:  Not since voir dire started, Your Honor, I don't believe. And the State may refresh my memory if it's –- such is the case.

> THE COURT:  Well, at any rate, you chose not to voir dire in that area, knowing full well that perhaps you believed that his co-Defendants were not going to roll over.  It would appear that they have.[138]

---

[137] *Id.*, at p. 5.

[138] S.F. Trial, Volume 14, at pp. 100-01.

Petitioner raised the same complaint about his trial counsel's failure to voir dire the entire jury venire on the accomplice-witness rule and plea bargains as part of his state habeas corpus application.[139]  During the evidentiary hearing held in petitioner's state habeas corpus proceeding, attorney Perez testified, in pertinent part, that (1) he did not address the accomplice witness rule during voir dire until about nine jurors had been selected, (2) he was surprised when Cruz's plea bargain was announced, and (3) he had not addressed the accomplice witness rule during voir dire until then because he had been led to believe there would be no plea bargains with petitioner's co-defendants.[140]

The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that (1) petitioner's trial counsel had good reason to believe, prior to October 25, 1999, that the prosecution had not entered into deals with Cruz, (2) once notified of Cruz's plea bargain, attorney Perez immediately incorporated the plea agreement into his overall trial defense, (3) the jury received instructions in the jury charge on both the accomplice-witness rule and the law of parties, and (4) petitioner presented no evidence suggesting the outcome of petitioner's trial would have been any different had petitioner's trial counsel conducted voir dire of the entire jury venire on the accomplice witness rule.[141]  The Texas Court of Criminal Appeals rejected this aspect of petitioner's ineffective assistance claims on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

3.     AEDPA Review

---

[139] State Habeas Transcript, Volume I, at pp. 42-44, 56.

[140] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at pp. 94-96.

[141] State Habeas Transcript, Volume II, at p. 31.

a.    No Deficient Performance

Until such time as petitioner's trial counsel knew or had reason to know that Cruz would testify as a prosecution witness pursuant to a plea bargain at petitioner's trial, there was nothing objectively unreasonable with the failure of petitioner's trial counsel to voir dire the venire members on the accomplice witness rule.  On the contrary, had petitioner's trial counsel done so and Cruz thereafter not testified, petitioner's trial counsel would likely have lost credibility in the eyes of the jury by injecting an issue that did not apply in petitioner's case.  Petitioner presented the state habeas court with no evidence suggesting that, prior to the prosecution's announcement of Cruz's plea bargain on October 25, 1999, petitioner's trial counsel had any reasonable basis to believe Cruz might testify against petitioner.  Petitioner's trial counsel cannot reasonably be faulted for failing to predict that Cruz would accept a plea bargain and agree to testify against petitioner. *See United States v. Fields*, 565 F.3d 290, 294 (5th Cir.)(clairvoyance is not a required attribute of effective representation), *cert. denied*, ___ U.S. ___, 130 S.Ct. 298 (2009); *Sharp v. Johnson*, 107 F.3d 282, 289 n.28 (5th Cir. 1997)(holding the same).  Contrary to the implications contained in petitioner's objection during voir dire, nothing in the Constitution precludes the prosecution from continuing to negotiate to secure inculpatory testimony from a co-defendant once a defendant's voir dire has commenced.  The failure of petitioner's trial counsel to voir dire members of the jury venire on the accomplice witness rule and plea bargains prior to October 25, 1999 did not cause the performance of said counsel to fall below an objective level of reasonableness.

b.    No Prejudice

Petitioner was convicted at the guilt-innocence phase of trial based upon the testimony of Moses Bazan (describing petitioner's fatal attack upon Ybarra), which was corroborated by the trial testimony of Johnny Joe Cruz (describing petitioner's fatal assault upon Ybarra), which, in turn, was corroborated in part by the trial testimony of Amalia Garcia (describing seeing (a) petitioner, Cruz, and Lujan preparing for the assault by putting bandanas and motel towels over their faces and (b) bloody motel towels inside the home of George Martinez and Angie Chavarria on the morning of the murder). Furthermore, the physical evidence at the crime scene corroborated both Cruz's and Bazan's trial testimony concerning the events inside room 15 on the night of the murder (particularly their testimony regarding Bazan's breaking a window and kicking through a wall while fighting off Cruz and Lujan). Ybarra's autopsy results corroborated the testimony of both Bazan and Cruz regarding the precise manner petitioner assaulted and fatally strangled Ybarra.

Petitioner's trial court instructed the jury at the guilt-innocence phase of trial in accordance with the Texas law of parties and the accomplice witness rule.[142] Juries are presumed

---

[142] In pertinent part, petitioner's guilt-innocence phase jury instructions stated as follows:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with commission of the offense,
>
> Mere presence alone will not make a person party [sic] to an offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

Trial Transcript, Volume II, at p. 322.

to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540 (1993); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

At the punishment phase of trial, the jury heard uncontradicted testimony (1) identifying petitioner as a participant, and having been convicted of aggravated assault, in connection with the murder of Robert Alva, (2) establishing petitioner had been convicted of assault with bodily injury in August, 1986, (3) establishing petitioner executed Richard Pacheco on March 5, 1992 by shooting a reclining Pacheco twice in the face at point-blank range as part of an effort by the Mexican Mafia to enforce collection of "the dime," (4) establishing petitioner very nearly fatally stabbed Hector Zacarias in May, 1992, (5) after his arrest for stabbing Zacarias, petitioner shouted threats against those present and bragged about his affiliation with "La Eme," and (6) establishing petitioner participated with others in a series of burglaries and a pair of armed robberies for which petitioner had never been arrested.  Petitioner's capital sentencing jury heard

---

You are instructed that an accomplice witness, as the term is hereinafter used, means any person connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime, as such parties, by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense and whether or not they were present and participated in the commission of the crime.

You are instructed that a conviction cannot be had upon the testimony of an accomplice witness unless the jury first believes that the accomplice witness' testimony is true and that it shows the defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice witness' testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but is must tend to connect the defendant with its commission.

Trial Transcript, Volume II, at p. 325.

no evidence suggesting petitioner had ever expressed remorse or demonstrated sincere contrition for any of his criminal misconduct.

There is no reasonable probability that, but for the failure of petitioner's trial counsel to voir dire the entire jury venire on the accomplice witness rule and Cruz's plea bargain, the outcome of either phase of petitioner's capital murder trial would have been any different.

4.      Conclusions

Petitioner's complaint about his trial counsel's failure to voir dire the entire jury venire regarding the accomplice-witness rule and Cruz's plea agreement does not satisfy either prong of the *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits during petitioner's state habeas corpus proceeding of this aspect of petitioner's ineffective assistance claims was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.

G.      Failure to Request a Limiting Jury Instruction Regarding Petitioner's Gang Affiliation

1.      The Complaint

Petitioner argues that his trial counsel should have requested a limiting instructions regarding petitioner's membership in the Mexican Mafia.[143]

2.      State Court Disposition

---

[143] *Petition*, at pp. 43-46, 56-57.

Petitioner argued in his third point of error on direct appeal that the trial court erred in admitting evidence of petitioner's membership in the Mexican Mafia.[144]  The Texas Court of Criminal Appeals rejected this point on the merits, concluding petitioner's gang affiliation was relevant to show a motive for petitioner's gang–related crime and admissible under Texas evidentiary rules despite the potentially prejudicial impact from such evidence. *Vasquez v. State*. 67 S.W.3d at 239-40.

Petitioner argued in his state habeas corpus application that his trial counsel should have requested a limiting instruction (presumably to limit the jury's consideration of petitioner's Mexican Mafia membership to the issue of petitioner's motive for Ybarra's murder).[145]  The state habeas court found (and the Texas Court of Criminal Appeals adopted a finding) that petitioner's trial counsel made a motion in limine but did not object to the bulk of the evidence relating to petitioner's Mexican Mafia membership.[146]  During petitioner's state habeas corpus hearing, petitioner's lead trial counsel testified, in pertinent part, that he made a strategic decision not to hide the ball regarding evidence of petitioner's Mexican Mafia affiliation, which said counsel was convinced was going to come into evidence.[147]  The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted conclusions, that evidence of petitioner's Mexican Mafia gang affiliation was necessary to establish his motive and, therefore, properly admitted

---

[144] Appellant's Brief, at pp. 21-24.

[145] State Habeas Transcript, Volume I, at pp. 44-47, 56-58.

[146] State Habeas Transcript, Volume II, at p. 32.

[147] S.F. State Habeas Hearing. Volume I, testimony of Joel Perez, at pp. 94, 96-97, 105.

into evidence at trial.[148]  The Texas Court of Criminal Appeals rejected this aspect of petitioner's

ineffective assistance claims on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL

3842857, *1.

       3.       AEDPA Review

          a.      No Deficient Performance

Petitioner's trial counsel testified the defense team made a strategic decision not to

actively contest the admission of evidence of petitioner's Mexican Mafia membership or to seek

a limiting instruction because (1) he was convinced the evidence was going to be admitted and

(2) the defense team did not want to appear to be "hiding the ball" with regard to such evidence.

The Texas Court of Criminal Appeals' conclusion that, under the Texas Rules of

Evidence, evidence of petitioner's Mexican Mafia gang affiliation was admissible to show

motive binds this federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)("We

have repeatedly held that a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.");

*Paredes v. Quarterman*, 574 F.3d at 291 (quoting *Bradshaw v. Richey* for the proposition that a

state court's interpretation of state law binds a federal habeas court); *Amador v. Quarterman*, 458

F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state

law).  Thus, the legal premise underlying petitioner's defense team's trial strategy appears to

have been legally valid.

---

[148] State Habeas Transcript, Volume II, at p. 33.

Petitioner's trial counsel reasonably concluded petitioner's Mexican Mafia membership, and Cruz's testimony regarding petitioner's actions on behalf of the Mexican Mafia, was going to be admitted into evidence at petitioner's capital murder trial.  The reason is that petitioner's membership in the Mexican Mafia was clearly relevant to petitioner's motive for killing Ybarra. Petitioner's trial counsel could reasonably have believed requesting such a limiting jury instruction every time a prosecution witness testified regarding petitioner's Mexican Mafia membership would have proven counter-productive.  The decision by petitioner's defense team not to seek a limiting jury instruction regarding evidence of petitioner's Mexican Mafia membership did not cause the performance of said counsel to fall below an objective level of reasonableness.  Petitioner's trial counsel reasonably concluded that requesting a limiting instruction might have created the impression the defense team was attempting to "hide the ball" and antagonize the jury.  Petitioner failed to present any evidence showing his trial counsel's strategic decision fell outside the wide range of objectively reasonable, professionally acceptable, legal representation.

> b.    No Prejudice

With or without a limiting jury instruction, petitioner's jury was going to learn of petitioner's Mexican Mafia membership and hear Cruz's testimony regarding the reasons why petitioner and Lujan (both Mexican Mafia members) broke into Ybarra's and Bazan's motel room, fatally strangled Ybarra, very nearly killed Bazan, ransacked the room, stole valuables, and then retreated to the home of another individual with ties to the Mexican Mafia.

As was explained in Section VI.F.3.b. above, the testimony of Bazan and Cruz was, for the most part, consistent with one another and corroborated by physical evidence at the crime scene and the medical examiner's findings following Ybarra's autopsy.

Both the petitioner's demonstrated propensity for violent criminal acts and the absence of any evidence showing petitioner had ever expressed genuine remorse or sincere contrition for any of his many violent criminal actions were made abundantly clear during the punishment phase of petitioner's capital murder trial.

There is no reasonable probability that, but for the failure of petitioner's trial counsel to request a limiting jury instruction regarding evidence of petitioner's Mexican Mafia membership, the outcome of either phase of petitioner's capital murder trial would have been any different.

4.      Conclusions

Petitioner's complaint about his trial counsel's failure to request a limiting jury instruction regarding petitioner's Mexican Mafia membership satisfies neither prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits during petitioner's state habeas corpus proceeding of this aspect of petitioner's ineffective assistance claims was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.

H.      Failure to Object to Evidence of Drug Party

1.      The Complaint

97

Petitioner argues his trial counsel should have objected to the admission of evidence showing teenage girls were smoking marijuana, drinking alcohol, and shooting heroin in petitioner's motel room in the hours leading up to Ybarra's murder.[149]

### 2.      State Court Disposition

Petitioner presented this same complaint as part of his state habeas corpus application.[150] During petitioner's state habeas corpus hearing, petitioner's former lead trial counsel testified, in pertinent part, that he made a strategic decision not to challenge the evidence of rampant drug abuse in petitioner's motel room in the hours immediately before Ybarra's murder because such evidence was helpful to the defense in attacking Cruz's credibility, i.e., it permitted petitioner's trial counsel to show the jury that Cruz had sold drugs to minors.[151]  The state habeas trial court concluded, and the Texas Court of Criminal Appeals adopted the conclusion, that the evidence of rampant drug use in petitioner's motel room was beneficial to the defense in that it helped to impeach not only Cruz but also prosecution witnesses Amalia Garcia and Michelle Rodriguez.[152] The Texas Court of Criminal Appeals rejected this aspect of petitioner's ineffective assistance claims on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

### 3.      AEDPA Review

####       a.      No Deficient Performance

---

[149] *Petition*, at pp. 47, 57-59.

[150] State Habeas Transcript, Volume I, at pp. 47, 58-60.

[151] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at p. 96.

[152] State Habeas Transcript, Volume II, at p. 35.

The decision by petitioner's trial counsel not to object to evidence of rampant drug abuse in petitioner's motel room in the hours leading up to Ybarra's murder was a reasonable trial strategy because it allowed petitioner's trial counsel to challenge the memories and accuracy of prosecution witnesses Cruz, Amalia Garcia, and Michelle Rodriguez.  The state habeas court's conclusion in that regard was a reasonable determination of the facts and application of the *Strickland* deficient performance prong.  At trial, in support of petitioner's trial counsels' strategy of challenging the credibility of Cruz and other prosecution witnesses, petitioner's trial counsel called an expert toxicologist who testified regarding the pernicious effects of cocaine and heroin abuse on the human brain.[153]  The trial strategy adopted by petitioner's trial counsel was objectively reasonable.

        b.     No Prejudice

For the reasons similar to those set forth in Sections VI.F.3.b. above and VI.G.3.b. above, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the admission of evidence showing rampant drug abuse in petitioner's motel room in the hours leading up to Ybarra's murder, the outcome of either phase of petitioner's capital murder trial would have been any different.

Even without such evidence in the record, petitioner's jury was going to hear Bazan's horrific account of petitioner's, Cruz's, and Lujan's assaults upon himself and Ybarra.  Without evidence of the drug abuse that took place in petitioner's motel room shortly before Ybarra's murder, petitioner's trial counsel would have been left with even less basis for cross-examining

---

[153] S.F. Trial, Volume 20, testimony of James C. Garriott, at pp. 118-33.

and possibly impeaching Cruz, Amalia Garcia, and Michelle Rodriguez.  There is no reasonable probability that, but for the failure of petitioner's trial counsel to object to admission of testimony regarding drug use in petitioner's motel room prior to Ybarra's murder, the outcome of the guilt-innocence phase of petitioner's capital murder trial would have been any different.

There is no reasonable probability that, but for the absence of evidence of drug abuse in petitioner's motel in the hours leading up to Ybarra's murder, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

4.      Conclusions

Petitioner's complaint about his trial counsel's failure to object to the admission of evidence showing drug and alcohol abuse took place (in some cases by minors) in petitioner's motel room in the hours before Ybarra's murder satisfies neither prong of the *Strickland* analysis. The Texas Court of Criminal Appeals' rejection on the merits during petitioner's state habeas corpus proceeding of this aspect of petitioner's ineffective assistance claims was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.

I.      Failure to Object to the Prosecution's Closing Punishment Phase Jury Argument

1.      The Complaints

Finally, petitioner argues his trial counsel should have objected to the prosecution's closing punishment-phase jury argument (1) describing petitioner as "perhaps the most

dangerous man to ever set foot in this building," and (2) describing as peaceful the procedure of lethal injection employed by the State of Texas.[154]

2.      State Court Disposition

During the closing argument portion of the punishment phase of petitioner's capital murder trial, the prosecutor argued without objection (1) "I would hazard to guess that he may be perhaps the most dangerous man to ever set foot in this building,"[155] and (2) the jury should contrast what the prosecutor described as a relatively peaceful method of lethal injection utilized in Texas with the violent manner with which petitioner dispatched Juanita Ybarra.[156]

Petitioner presented these same complaints in his state habeas corpus application, arguing the prosecutor's comments improperly expressed the prosecutor's personal belief in the propriety of a death sentence, appealed to the jury's fears, and inaccurately asserted that death by lethal injection was instantaneous.[157]  During petitioner's state habeas corpus hearing, attorney Perez testified that, at the punishment phase of trial, "I was trying to salvage all the credibility that I could and not look obstructive."[158]

---

[154] *Petition*, at pp. 47-48, 59-61.

[155] S.F. Trial, Volume 24, at p. 19.

[156] *Id.*, at pp. 20-21.

[157] State Habeas Transcript, Volume I, at pp. 48, 60-61.

[158] S.F. State Habeas Hearing, Volume I, testimony of Joel Perez, at p. 98.

The state habeas trial court made numerous findings of fact and conclusions of law regarding this particular ineffective assistance complaint[159] but the Texas Court of Criminal Appeals rejected all of the state habeas trial court's factual findings and all but the last of the habeas trial court's legal conclusions (concluding there was no prejudice shown under *Strickland*) when that court rejected this aspect of petitioner's ineffective assistance claims on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

     3.      AEDPA Review

         a.      No Deficient Performance

Under Texas law, proper jury argument consists of either (1) a summation of the evidence, (2) a reasonable deduction from the evidence, (3) a response to an opponent's argument, or (4) a plea for law enforcement. *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008)(*quoting Gomez v. State*, 704 S.W.2d 770, 771 (Tex. Crim. App. 1985), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2378, 173 L.Ed.2d 1299 (2009).

As has been explained above, by the time of closing argument at the punishment phase of petitioner's capital murder, trial, petitioner's jury had already determined beyond a reasonable doubt that petitioner was criminally responsible for Ybarra's murder.  Moreover, the jury had also uncontradicted testimony (1) identifying petitioner as a participant, and having been convicted of aggravated assault, in connection with the murder of Robert Alva, (2) establishing petitioner had been convicted of assault with bodily injury in August, 1986, (3) establishing petitioner executed Richard Pacheco on March 5, 1992 by shooting a reclining Pacheco twice in

---

[159] State Habeas Transcript, Volume II, at pp. 36-39.

the face at point-blank range as part of an effort by the Mexican Mafia to enforce collection of "the dime," (4) establishing petitioner very nearly fatally stabbed Hector Zacarias in May, 1992, (5) after his arrest for stabbing Zacarias, petitioner shouted threats against those present and bragged about his affiliation with "La Eme," and (6) establishing petitioner participated with others in a series of burglaries and a pair of armed robberies for which petitioner had never been arrested.

Petitioner's trial counsel could have considered an objection unlikely to garner any benefit to the defense other than possibly an order from the trial court directing the jury to disregard the offending comment by the prosecutor. Petitioner's trial counsel could have reasonably concluded that making an objection to the prosecutor's remark about petitioner's dangerousness might call the jury's attention to the same more so than would be the case if the prosecutor were permitted to continue with oral argument uninterrupted.

As for the prosecutor's suggestion that Texas' method of lethal injection was relatively painless, petitioner correctly points out there was no evidence in the record establishing same. However, as was true with the prosecutor's comment about petitioner's dangerousness, petitioner's trial counsel could reasonably have concluded objecting to the argument might call the jury's attention to the same more so than allowing the prosecutor to continue with his closing argument uninterrupted.

The failure of petitioner's trial counsel to object to either of the comments in question, perhaps out of a desire to maintain some semblance of credibility with petitioner's capital sentencing jury, did not cause the performance of said counsel to fall outside the wide range of objectively reasonable legal representation.

b.      No Prejudice

Given the ample evidence of petitioner's demonstrated record of violent criminal conduct and propensity for future violence, together with the lack of any evidence showing petitioner has ever expressed any sincere contrition or genuine remorse for any of his criminal actions presented to petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to either or both of the prosecutor's comments in question, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.  The uncontradicted evidence before petitioner's capital sentencing jury showed petitioner (1) had killed at least three persons and barely avoided killing a fourth (each in an extremely violent manner), (2) had engaged in a series of burglaries and a pair of armed robberies, and (3) had never expressed remorse or contrition for any of his criminal misconduct.  Under such circumstances, the failure of petitioner's trial counsel to object to the comments made by the prosecutor during closing argument did not "prejudice" petitioner within the meaning of *Strickland*.

4.      Conclusions

Petitioner's complaint about his trial counsel's failure to object to the two prosecutorial comments in question satisfies neither prong of the *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits during petitioner's state habeas corpus proceeding of this aspect of petitioner's ineffective assistance claims was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.

104

J.      Ultimate Conclusions

None of petitioner's complaints of ineffective assistance by his trial counsel satisfy either

prong of *the Strickland* analysis.  The evidence of petitioner's guilt, propensity for future

violence, and lack of remorse and contrition for his crimes was overwhelming.  The Texas Court

of Criminal Appeals' rejection on the merits during petitioner's state habeas corpus proceeding

of all of petitioner's complaints of ineffective assistance claims was neither (1) contrary to, nor

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts

in light of the evidence presented during that proceeding.  Petitioner's fourth claim herein does

not warrant federal habeas corpus relief.

VII. *Cronic* Presumption of Prejudice Inapplicable

A.      The Claim

In his fifth claim herein, petitioner argues he is entitled to the benefit of the presumption

of prejudice which arises under the Supreme Court's holding in *United States v. Cronic*, 466 U.S.

648 (1984).[160]

B.      State Court Disposition

Petitioner presented an identical argument as his fifth claim for state habeas corpus

relief.[161]  The Texas Court of Criminal Appeals rejected the state habeas trial court's findings of

fact and conclusions of law with regard to that claim but nonetheless rejected petitioner's state

---

[160] *Petition*, at pp. 61-62.

[161] State Habeas Transcript, Volume I, at pp. 61-62.

105

habeas corpus application on the merits. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

C.      AEDPA Analysis

In *United States v. Cronic*, *supra*, decided the same day as *Strickland*, the Supreme Court held a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466 U.S. at 659.  As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318 (1974)(defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45 (1932)(no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic*, 466 U.S. at 659-61.

Petitioner was represented throughout his state trial by two attorneys, Joel Perez and Wendellyn Rush, who were aided by a court-appointed investigator and a defense DNA expert. Thus, the first situation in which the *Cronic* presumption of prejudice arises is inapplicable to petitioner's trial.

In *Bell v. Cone*, 535 U.S. 685, 695-96 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which  defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at 697-98 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).  Simply put, ineffective assistance claims of the nature asserted by petitioner in his fourth claim herein do not warrant application of the second situation recognized in *Cronic* authorizing a presumption of prejudice.  The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U.S. at 697 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364 (5th Cir. 2003)("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002)(holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953 (2002); *Mayo v. Cockrell*, 287 F.3d 336, 340 n.3 (5th Cir. 2002)(holding the same), *cert. denied*, 537 U.S. 975 (2002).

Petitioner alleged no facts, and presented the state habeas court with no evidence, showing the circumstances of his trial were so incendiary that it would have been impossible for petitioner to receive a fair and impartial public trial. Petitioner does not identify with specificity any biased jurors who sat on his petit jury. Nor has petitioner identified any alleged deficiency in the performance of his trial counsel that rises above an ex post facto disagreement over trial strategy.

Petitioner has failed to allege any specific facts, much less furnished any admissible evidence, establishing that his trial counsel's performance fell within any of the categories recognized in *Cronic* as a basis for a presumption of prejudice.

Furthermore, as respondent correctly argues, extending the presumed prejudice rule of *Cronic* to claims of ineffective assistance like those asserted by petitioner herein would run afoul of the non-retroactivity doctrine announced in *Teague v. Lane, supra.*

D.    Conclusions

Insofar as petitioner seeks to extend the presumed prejudice rule announced in *Cronic* to the type of ineffective assistance claims petitioner asserts in this federal habeas corpus proceeding, that effort is foreclosed by the non-retroactivity doctrine of *Teague v. Lane, supra.* The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's state habeas corpus proceeding of petitioner's claim arguing he was entitled to the presumption of prejudice recognized in *Cronic* was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence

108

presented during that proceeding.  Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

## VIII. Vague "Aggravating Factors"

A.     The Claim

In his sixth claim herein, petitioner argues several terms used in the Texas capital sentencing special issues are unconstitutionally vague.[162]

B.     State Court Disposition

At the punishment phase of petitioner's capital murder trial, the state trial court instructed the jury to answer the Texas capital sentencing special issues, which inquired whether (1) there was a reasonable probability petitioner "would commit criminal acts of violence that would constitute a continuing threat to society," (2) petitioner actually caused Ybarra's death or intended to kill Ybarra or another or anticipated that a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense and the petitioner's character, background, and personal moral culpability, there was a sufficient mitigating circumstance to warrant that a life sentence be imposed rather than the death penalty.[163]  Petitioner's trial counsel raised no objections to the lack of definitions of the terms employed in the trial court's proposed punishment phase jury charge.[164]

---

[162] *Petition*, at pp. 62-64.

[163] Trial Transcript, Volume II, at pp. 305-07

[164] Trial Transcript, Volume 23, at pp. 101-02.

Petitioner raised the same complaint as his sixth claim herein for the first time in his state habeas corpus application.[165]  The state habeas court rejected this claim on the merits and also concluded petitioner had procedurally defaulted on same by failing to present his challenges to the Texas capital sentencing special issues on direct appeal.[166]  The Texas Court of Criminal Appeals adopted those conclusions when it denied petitioner's state habeas corpus application. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

## C.    Procedural Default

Petitioner could have raised his complaint about the statutory language contained in his punishment phase jury charge on direct appeal but failed to do so, most probably because petitioner had failed to comply with the Texas contemporaneous objection rule.  Under well-settled Fifth Circuit precedent, the Texas Court of Criminal Appeals' procedural ruling identifying petitioner's failure to raise his complaint about the Texas statutory capital sentencing special issues on direct appeal constitutes a procedural default barring federal habeas review of that claim. *See, e.g., Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004), (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) *modified* on motion for rehearing on February 2, 1998, to recognize this new procedural default rule, "firmly entrenched" that procedural default rule on that date), *cert. denied*, 541 U.S. 1087 (2004); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001)(holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory

---

[165] State Habeas Transcript, Volume I, at pp. 62-64.

[166] State Habeas Transcript, Volume II, at p. 40.

110

supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000)(holding a federal habeas petitioner procedurally defaulted on a fair cross-section complaint by failing to raise it in a direct appeal that became final in 1997), *cert. denied*, 530 U.S. 1286 (2000).

Petitioner argues, without any citation to authority, that because his trial counsel did not make a contemporaneous objection to the alleged defects contained in his punishment phase jury charge included in petitioner's final two claims herein, those complaints were not properly preserved for state appellate review and, therefore, petitioner's procedural default in failing to present those claims as part of his direct appeal should be forgiven.[167]  There is, however, no legal support for petitioner's proposed "new rule" suggesting that two state procedural defaults cancel each other out.  That petitioner procedurally defaulted at trial by not timely objecting to alleged defects in his punishment phase jury charge and thereafter procedurally defaulted again by failing to present his complaints about his punishment phase jury charge on direct appeal does not transform petitioner's twice procedurally defaulted claims into claims properly subject to federal habeas review.  To hold otherwise would stand the principle of procedural default on its head.

D.     AEDPA Review: Alternatively, No Merits

Alternatively, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaints about the lack of definitions of key terms contained in the Texas capital sentencing special issues lacks any arguable merit.  The Fifth Circuit and this Court have both repeatedly

---

[167] Petitioner's Reply to Respondent's Answer, filed December 21, 2011, docket entry no. 21, at pp. 7-8.

rejected exactly the same complaints. *See Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007)(rejecting arguments that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence), *cert. denied*, 551 U.S. 1193 (2007); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005)(listing the many Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society" in the first Texas capital sentencing special issue), *cert. denied*, 547 U.S. 1073 (2006).

E.    *Teague* Foreclosure

Adopting the new rule advocated by petitioner in his sixth claim herein would violate the non-retroactivity principle announced in *Teague v. Lane, supra.*

F.    Conclusions

Petitioner procedurally defaulted on his complaints about allegedly vague terms in the Texas capital sentencing scheme's future dangerousness special issue by failing to present those complaints to the state courts in his direct appeal.

Petitioner's legal arguments supporting his sixth claim for relief are foreclosed by the Supreme Court's holding in *Teague v. Lane.*

Alternatively, the Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's state habeas corpus proceeding of petitioner's complaints about the lack of definitions of key terms in the Texas capital sentencing special issues was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.  Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

IX. Challenge to Texas' Twelve-Ten Rule

A.      The Claim

In his seventh and final claim herein, petitioner argues Article 37.071 of the Texas Code of Criminal Procedure may have arbitrarily forced petitioner's capital sentencing jury to continue its deliberations after "every juror voted to answer a special issue in favor of petitioner," in violation of the legal principles announced by the united States Supreme Court in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990).[168]

B.      State Court Disposition

Petitioner made no objection alerting the state trial court to this alleged error in his punishment phase jury charge.[169]  Instead, petitioner raised this argument for the first time in his state habeas corpus application.[170]  The state habeas court concluded petitioner had procedurally defaulted on this complaint by failing to present same on direct appeal and, alternatively rejected same on the merits.[171]  The Texas Court of Criminal Appeals adopted these conclusions when it

---

[168] *Petition*, at pp. 64-65.

[169] S.F. Trial, Volume 23, at pp. 101-02.

[170] State Habeas Transcript, Volume I, at pp. 64-65.

[171] State Habeas Transcript, Volume II, at pp. 40-41.

denied petitioner's state habeas corpus application. *Ex parte Manuel Vasquez*, WR 71,807-01, 2009 WL 3842857, *1.

C.     Procedural Default

For the same reasons set forth above in Section VIII.C., petitioner procedurally defaulted on his complaints about his punishment phase jury charge by failing to raise those complaints in his direct appeal.

D.     AEDPA Review: Alternatively, No Merits

The Fifth Circuit and this Court have both repeatedly rejected the exact same challenge to the Texas capital sentencing scheme's twelve-ten rule contained in petitioner's seventh claim herein.  See *Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011)(rejecting Eighth Amendment arguments challenging the Texas twelve-ten rule), *cert. filed March 21, 2012 (no. 11-9526)*; *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims virtually identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000)(holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849 (2000).

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  The Supreme Court has consistently applied this standard to evaluate

114

challenges to punishment-phase jury instructions. *See Weeks v. Angelone*, 528 U.S. 225, 226 (2000)(emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U.S. 373, 390 & n.9 (1999)(holding the same).

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 380.  This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).  "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368; *Boyde v. California*, 494 U.S. at 381.

Nothing in petitioner's punishment-phase jury charge can reasonable be construed as foreclosing the consideration by petitioner's jury of any of the potentially mitigating evidence actually presented during petitioner's capital murder trial.  None of petitioner's jurors could rationally have been led to believe by petitioner's punishment-phase jury charge that either (1) they lacked the authority to answer either of the Texas capital special issues in a manner consistent with their conscience and the evidence regardless of the votes of other jurors or (2) their determination to vote in a manner inconsistent with other jurors would have no legal impact.  There is no reasonable likelihood any of petitioner's jurors construed their punishment

115

phase jury instructions in a manner which prevented them from considering or giving effect to any constitutionally relevant mitigating evidence.

Likewise, nothing in petitioner's punishment-phase jury charge misled petitioner's capital sentencing jury regarding its role as the ultimate arbiter of petitioner's fate.  Insofar as petitioner complains that his jury was not specifically instructed that a failure by the jury to answer either of Texas capital sentencing issue (based upon the jury's inability to reach unanimity in favor of answers favorable to the prosecution or to marshal at least ten votes for answers favorable to the defense), that argument is foreclosed by both Supreme Court and Fifth Circuit precedent recognizing there is no constitutional right to jury instructions instructing individual jurors how they can achieve a "hung jury." *See Jones v. United States*, 527 U.S. 373, 382 (1999)(the Eighth Amendment does *not* require a capital sentencing be instructed as the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death); *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011)(holding an argument that a Texas capital defendant had a constitutional right to an instruction informing the jury of the impact of a hung jury barred under the non-retroactivity doctrine of *Teague v. Lane*), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1550 (2012); *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir.) (recognizing Fifth Circuit precedent foreclosed arguments that the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict), *cert. denied*, 551 U.S. 1193 (2007).

116

There is no arguable legal merit to any of the constitutional arguments presented by petitioner in support of his last claim in this cause.  The petitioner's punishment-phase jury charge accurately informed petitioner's capital sentencing jury of their responsibility under Texas law to reach a verdict favorable to the prosecution only if they agreed unanimously on both of the Texas capital sentencing special issue and to return a verdict favorable to the defense on either of those special issue only if ten or more jurors agreed to do so.  The Eighth and Fourteenth Amendments required nothing more.

E.    *Teague* Foreclosure

For the same reasons set forth in Section VIII.D. above, adopting the "new rule" advocated in petitioner's seventh and final claim in this federal habeas corpus proceeding would run afoul of the non-retroactivity principle announced in *Teague v. Lane, supra.*

F.    Conclusions

Petitioner procedurally defaulted on his complaint about Article 37.071's application to the Texas capital sentencing special issues by failing to present that complaint to the state courts in his direct appeal.

Petitioner's legal arguments supporting his seventh claim for relief are foreclosed by the Supreme Court's holding in *Teague v. Lane.*

Alternatively, the Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's state habeas corpus proceeding of petitioner's complaint about the application of Article 37.071's twelve-ten rule to his punishment phase jury charge was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as

117

determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented during that proceeding.  Petitioner's seventh claim herein does not warrant federal habeas corpus relief.

## X. Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing to further develop the factual and evidentiary basis for his claims herein.[172]  However, petitioner was afforded a full and fair evidentiary hearing in the course of his state habeas corpus proceeding.  Under the AEDPA, the proper place for development of the facts supporting a claim is the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.)(holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U.S. 984 (1997).  Furthermore, where a petitioner has been afforded a full and fair evidentiary hearing in state court, and his claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's recent holding in *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1398-1400 (2011)(holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d)(1)). *See Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011)(holding the same), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1100 (2012).  Petitioner had an evidentiary hearing in state court on all of his claims for relief herein.

## XI. Certificate of Appealability

---

[172] *Petition*, at p. 74.

118

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom., Monroe v. Johnson*, 523 U.S. 1041 (1998). Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537

119

U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336.  This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim.  If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong.  "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484). *Accord Tennard v. Dretke*, 542 U.S. at 282.  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484

(holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 536 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See* Miller-El v. Cockrell 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Reasonable minds could not disagree over this Court's conclusions as to petitioner's procedural defaults on his complaints about his punishment phase jury instructions contained in petitioner's sixth and seventh claims herein.  Reasonable minds could not disagree with this Court's conclusions regarding petitioner's failure to present the state habeas court with evidence showing actual under-representation of Hispanics on the venires, panels, or pools of eligible voters employed to select Bexar County grand jurors.  Reasonable minds could not disagree with this Court's conclusions that petitioner failed to show the state habeas court that any information allegedly withheld by the prosecution from petitioner's trial counsel satisfied the materiality prong of *Brady* analysis.

This Court has independently reviewed the record from petitioner's trial, direct appeal, and state habeas corpus proceeding and has concluded none of petitioner's ineffective assistance claims herein satisfy either prong of the *Strickland* analysis.  Reasonable minds could not disagree over this Court's conclusions as the inability of any of petitioner's ineffective assistance claims herein to satisfy the prejudice prong of *Strickland*.  There was overwhelming evidence of petitioner's guilt furnished primarily by the testimony of petitioner's surviving victim Moses Bazan, which was corroborated by the evidence from Ybarra's autopsy as well as the testimony of petitioner's accomplice Johnny Joe Cruz, and the physical evidence at the crime scene.

Reasonable minds could not disagree with this Court's conclusion that petitioner's fifth, sixth, and seventh claims herein are all barred by *Teague*.

Both this Court and the Fifth Circuit have repeatedly held the claims contained in petitioner's sixth and seventh claims herein are unworthy of a CoA. *See, e.g., Blue v. Thaler*, 665 F.3d at 662-70 (rejecting a CoA for petitioner's constitutional challenges herein to the Texas capital sentencing scheme); *Druery v. Thaler*, 647 F.3d at 542-45 (holding challenges to the Texas twelve-ten rule identical to petitioner's herein were unworthy of a CoA); *Jasper v. Thaler*, 765 F.Supp.2d at 875 (holding challenges to the Texas capital sentencing scheme identical to petitioner's sixth and seventh claims herein were unworthy of a CoA); *Bartee v. Quarterman*, 574 F.Supp.2d at 713 (holding challenges to the Texas capital sentencing scheme identical to petitioner's herein did not warrant a CoA).

For the foregoing reasons, this Court concludes petitioner is not entitled to a Certificate of Appealability with regard to any of his claims herein.

Accordingly, it is hereby ORDERED that:

1.  All relief requested in petitioner's federal habeas corpus petition, filed November 12, 2010, docket entry no. 13, as supplemented by petitioner's reply to respondent's answer, filed December 21, 2011, docket entry no. 21, is DENIED.

2.  Petitioner is DENIED a Certificate of Appealability on all claims herein.

3.  Petitioner's request for an evidentiary hearing is DENIED.

4.  All other pending motions are DISMISSED AS MOOT.

5.  The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

It is so ORDERED.

SIGNED this 19th day of July, 2012.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE